**BIG CHIEF DRILLING COMPANY,**
**Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 118–86C.

United States Claims Court.

Sept. 25, 1992.

Wesley C. Fredenburg, Oklahoma City, Okl., for plaintiff, Andrew M. Coats, of counsel.

John E. Kosloske, Washington, D.C., with whom were Asst. Atty. Gen., Stuart M. Gerson, David M. Cohen, Director, and Thomas W. Peterson, Asst. Director, for defendant.

## OPINION

HORN, Judge.

The plaintiff, Big Chief Drilling Company (Big Chief), brought this action under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1988). The jurisdiction of this court is uncontested under 41 U.S.C. § 609 (1988).

Prior to filing its complaint in the United States Claims Court, on December 4, 1983, Big Chief filed a claim with the Department of Energy (DOE) requesting reimbursement in the amount of $906,525.93. The claim to DOE related only to well number 108A and requested reimbursement for expenses incurred as a result of the loss of the casing shoe and for expenses arising from lost circulation.

Based upon a meeting between the parties, held on May 8, 1984, Big Chief submitted a revised claim to the contracting officer on June 14, 1984. The resubmitted claim requested reimbursement in the

amount of $646,801.77. This revised claim related to the loss of the casing shoe and omitted the claim for lost circulation.

On July 14, 1984, final payment on the contract was made and on April 1, 1985, the contracting officer issued a final decision, denying the contractor's claims for additional compensation. Big Chief subsequently filed its complaint in the United States Claims Court.[1]

In its complaint filed in this court, the plaintiff claims it suffered monetary damages as a result of defects in the contract specifications and omissions or mistakes by the government's on-site representatives during contract performance. The defendant filed an answer in which it requested dismissal of the complaint and filed a motion for summary judgment. After consideration of the papers submitted by both parties, and the arguments presented orally to the court, the defendant's motion for summary judgment was denied in an Opinion issued by this court, *Big Chief Drilling Co. v. United States*, 15 Cl.Ct. 295 (1988). The subsequent trial in the case lasted 10 days. After the trial, both sides submitted post-trial briefs to the court.

## FACTS

On December 22, 1982, the DOE, Strategic Petroleum Reserve Project Management Office, Louisiana, issued an invitation for bids (No. DE–FB–96–83–P010872) for a fixed-price (turnkey) construction type contract.[2] The project involved the drilling of ten cavern wells at the DOE Strategic Petroleum Reserve, Big Hill, Oil Storage Facility in Jefferson County, Texas.

The wells which were the subject of the DOE solicitation were to be drilled in the "Big Hill salt dome," a geologic formation in southwestern Jefferson County, Texas, near the Gulf Coast of Mexico. The Big Hill salt dome, which is within the Gulf Coast geosyncline,[3] is a diapiric, piercement structure formed from the Louann salt formation. The Big Hill salt dome, like other salt domes, formed as a result of plastic upward movement of deeply buried salt, initiated by the tremendous weight of

---

1. After the case was filed, but prior to overseeing the proceedings in the instant case, the court held a status conference on the record with counsel for both parties. At the conference, this judge informed the parties that from January 1975 to June 1981, she had worked for the Department of Energy (DOE), and from September 1976 to August 1979, she had worked on issues related to the Strategic Petroleum Reserve Program. In addition, this judge informed the parties that she left the DOE in 1981 and became an employee of the Department of the Interior. The contract at issue was entered into more than a year and one half after her departure from the DOE.

Following a discussion between counsel and the court about the judge's role at DOE, both parties separately indicated to the court that they had no objection to the undersigned judge presiding over the proceedings in the above-captioned case. Counsel stated:

MR. FREDENBURG [for the plaintiff]: I don't have any trouble saying that I have absolutely no objection to you staying on the case. I think if anything else your background will assist both parties because you will know more than one might otherwise, and relieve us of that discovery obligation, so. Yeah, that's fine. I have no objection.
THE COURT: Thank you. Mr. Schall?
MR. SCHALL [for the defendant]: Yes, Your Honor. Based upon what you've said on your own and in response to counsel's questions, the government certainly has no objection to your continuing to preside in this matter.

2. A "turnkey" type contract is a contract in which an independent drilling contractor undertakes to furnish all materials and labor and to do all the work required to complete a well in a workmanlike manner, place it on production and turn it over ready to "turn the key" and start the oil running into the tanks for an amount stipulated in the contract. *See Continental Oil Co. v. Jones*, 177 F.2d 508, 510 (10th Cir.1949), *cert. denied*, 339 U.S. 931, 70 S.Ct. 666, 94 L.Ed. 1351 (1950). Or, stated differently:

On a 'turnkey' basis, the parties agree on a fixed sum of money that will be paid to the drilling contractor in return for his furnishing a drilling crew, drilling equipment and certain specified materials and services, to be due and payable only after the hole is drilled to contract depth; all other services, materials and equipment are furnished at the cost of the well owner.

*Haas v. Gulf Coast Natural Gas Co.*, 484 S.W.2d 127, 131 (Tex.Civ.App.1972).

3. A geosyncline is a large, elongated and thick deposit of continental shelf and slope settlements. *See* The Petroleum Dictionary 144 (1st ed. 1980).

dense overlying sediments upon the less dense salt.

The subsurface stratum immediately above the Big Hill salt dome is known as "caprock." [4] The Strategic Petroleum Reserve "Geological Site Characterization Report" prepared by Sandia National Laboratories (Sandia Report) [5] for the Big Hill salt dome, identifies the caprock at Big Hill as comprised of two distinct layers: (1) a thick upper layer of limestone and gypsum, and (2) a lower layer of anhydrite. The top of caprock at the Big Hill site is roughly dome-shaped, rounded on the top and steeping at the edges. At the Big Hill site, the limestone and gypsum upper interval of the caprock is 200 to 300 feet below the surface, and is approximately 750 feet thick. The anhydrite interval of the caprock is encountered at approximately 1100 feet and extends to the salt dome, which is encountered at approximately 1650 feet. The thickness of the caprock at Big Hill varies from 850 to 1350 feet, making the Big Hill caprock one of the thickest known caprocks in the Gulf Coast region.

The Sandia Report classifies the caprock at Big Hill as vuggy, [6] with a complex lithology. Faults and fractures caused by dissolution of the salt, and collapse at the salt/caprock interface, result in a highly permeable, discontinuous unit. During periods of dome growth, solutioning of the salt occurs faster than uplift, resulting in formations of cavities at the salt/caprock contact. As cavities enlarge, overlying caprock collapses into the voids. This process is repeated, yielding a complex sequence of lithologies in the caprock.

Drillers' logs created during the drilling of sulphur-exploration wells in the Big Hill region, and relied on during the drafting of the Sandia Report, indicate that the upper caprock interval of limestone and gypsum can be soft to hard, competent to fractured, and porous to nonporous. Thomas R. Magorian, Ph.D., the defendant's expert witness, and one of the authors of the Sandia Report, testified at the trial in this matter that the upper layer of the caprock at Big Hill does not become denser as it approaches the lower anhydrite layer of the caprock. The lower, anhydrite layer of the caprock, which is immediately above the salt stock, is created from deposits of anhydrite salt and hydrite that accumulate upon the top of the salt as the salt moves into the ground water zone and is dissolved away. According to Dr. Magorian, the caprock at Big Hill is notoriously difficult to drill, marked by many problems with lost circulation.

The Strategic Petroleum Reserve Project Management Office held a pre-bid conference at its offices in Louisiana on February 3, 1983, which was attended by representatives of Big Chief. The parties have stipulated that the bidders were informed at the pre-bid conference that the differing site conditions clause would be deleted from the proposed contract. Prior to contract award, the differing site conditions clause was removed from the general provisions of the contract, pursuant to an approved deviation from applicable procurement reg-

---

**4.** As stated in the final decision issued by the contracting officer, "the contract utilizes the term 'caprock' as it is commonly understood in the industry...." "Caprock" is defined as, the impervious geological stratum which overlays the reservoir rock and retains gas or oil in a reservoir. *American Gas Ass'n, Glossary for the Gas Industry* 16 (3d ed. 1981).

**5.** The "Geological Site Characterization Report" was prepared by the Sandia National Laboratories, Albuquerque, NM. Sandia National Laboratories is operated for the United States Department of Energy by the Sandia Corporation, and was responsible for the geotechnical program of the Strategic Petroleum Reserve project. The Sandia Report was prepared by R.J. Hart and Terri Smith, in association with Thomas R. Ma-

gorian, Ph.D., consulting geologist and geophysicist, who provided the geological and geophysical analysis and interpretations that define the salt and surrounding geology. Dr. Magorian appeared before this court during these proceedings as one of the defendant's expert witnesses.

The Sandia Report is based upon a comprehensive survey of all available information on the Big Hill site, including published literature, files of regulatory agencies such as the Texas Railroad Commission, contacts with major operators, and prior drilling records, including geophysical logs.

**6.** "Vuggy" is defined as open spaces in a rock formation, or a small unfilled cavity in rock.

ulations requested by the contracting officer.

On March 4, 1983, Big Chief submitted its bid for the contract in the amount of $10,600,000.00. The contract, number DE–AC96–83P010872, was awarded to Big Chief on March 22, 1983. The task under the contract was to drill five sets of holes, two holes per set, into salt, for a total of ten wells.[7] Nine of the ten wells were completed without incident. This action concerns well number 108A.

THE CONTRACT

Paragraph 1.0 of Section F, Part I, Statement of Work of Contract DE–AC–96–83P010872, titled "INTRODUCTION," provides, in pertinent part:

The Contractor shall provide all equipment, personnel, services, supplies, and materials (except for Government Furnished Equipment (GFE) as specified in Section G) required to perform the construction (drilling) of cavern wells.[8] The Contractor shall provide free access to the drilling operation to the Contracting Officer or his designated representative. The Contractor shall:

1.1 Provide drilling rig(s), personnel, tools, materials, and equipment necessary to effectively and safely accomplish drilling and related operations described herein. The drilling rig shall have a minimum derrick and hook load capacity of 350,000 pounds, and a minimum substructure capacity of 500,000 pounds with a minimum clearance above the BOP stack of 5 feet.

1.2 Provide related services as required including but not limited to the following:

- Preparation of Well Pad location
- Water wells as required by Contractor
- Geolograph, (record penetration rate, weight on bit and rotary RPM)
- Welding and Welding inspection
- Conductor pipe driving
- Rathole and Mousehole
- Transportation, Material Handling and Roustabouts
- Vacuum Trucks
- Mud and Additives
- Logging
- Float Collars, Float and Guide Shoes
- Casing Handling Tools (including pick-up elevators)
- Cement, Service and Hardware
- Directional Surveys and Directional Drilling
- Wellhead installation and Orientation as required per WH & A Drawing BH–M–107–1 and manufacturer's installation instructions.
- Receipt, Storage, Maintenance and Accountability of Government Furnished Equipment (GFE).
- Disposal of mud and drill cuttings and maintenance disposal pits.
- Hydrostatic well testing
- Casing Centralizers and Cement Baskets
- Relocation of 30″ casing from Bryan Mound Site to the Big Hill Site.

\* \* \* \* \* \*

Paragraph 1.9 of Section F, Part I, Statement of Work, requires that the contractor, Big Chief, "[p]erform all casing welding operations including placement, double-jointing, and bradenhead installation...."

Paragraph 8.0, "LOGGING AND SAMPLING SPECIFICATIONS," Section F, Part II, Specifications, provides:

8.1 The Contractor shall provide the following logging services in Wells A and B prior to casing installation:

8.1.1 From a depth of approximately 15′ into the caprock up to the 42″ conductor pipe, run ISF/GR/FDC/SP/CNL & Sonic in Well A only.

---

7. The next phase of the Big Hill project was the actual construction of the cavern wells, which was done through a process called leaching. The actual construction of the cavern well was not a part of the Big Chief contract. This dispute centers around only the drilling of the well hole at well number 108A.

8. As specified in Section G, General Conditions, Government Furnished Equipment, the defendant was to furnish, among other items, all "tubular goods [Including 30–inch casing pipe] (except drill pipe), for performance of the work under this contract."

The depth to the top of caprock will be determined by:

- a decline in the rate of drill bit penetration, and
- cuttings which contain anhydrite, limestone or gypsum.

Concurrence of these factors must be obtained from the Contracting Officer or his designated representative.

\* \* \* \* \* \*

Paragraph 9.0, "CASING PROGRAM AND REQUIREMENTS," of Section F, Part II, Specifications, provides:

9.1 It is anticipated that the top of caprock will be encountered near a depth of 300', and the top of salt will be encountered near a depth of 1750'. Casing shall be installed to minimum depths and the hole drilled to sizes as defined below and as shown in Figures II.3, II.4 and tables G.1 and G.2 (Section G) for Wells A and B respectively.

\* \* \* \* \* \*

9.3 *Surface Casing:* The Contractor shall run and set 30" O.D., Grade B casing in a 36" hole from surface to 15' +/− 5' into the caprock. On the bottom 40' casing joint, weld a stab-in float collar on the top and a guide shoe on the bottom.

\* \* \* \* \* \*

Clause 600.4 of the General Provisions of the contract, titled "Differing Site Conditions," is lined out and marked "DELETED."

9. "Spudded in" is defined as the first boring of a hole in the drilling of a well. Manual of Oil and Gas Terms ¶ 933 (7th ed. 1987).

10. "Drilling mud" is fluid that is pumped by "mud pumps" from pits on the surface of the well down the well through the drill string during drilling operations. The fluid is designed to remove cuttings from the well caused by drilling operations. This mud or drilling fluid, in addition to lubricating the bit and removing the cuttings from the hole, keeps the drill stem free from interference from the sides of the bore as well as from sub-surface pressures, which are inherent in the formations through which the wells are cut. *See Burger Drilling Co. v. Bauman,* 643 F.2d 240, 241 (5th Cir. April 1981); *Fidelity–Phenix Fire Ins. Co. v. Dyer,* 220 F.2d 697 (5th Cir.1955). *See also* The Petroleum Dictionary 93 (1st ed. 1980).

PROJECT OVERVIEW

The plaintiff, Big Chief Drilling Company, received its notice to proceed from Gary C. Landry, the DOE contracting officer, on May 17, 1983, and began mobilization onto well pad 108A on June 11, 1983. Well number 108A was spudded in[9] on June 17, 1983, and completed 129 days later on October 23, 1983. Well number 108A was drilled by Big Chief with full time drilling inspection being performed by Walk, Haydel and Associates, Inc., engineers on behalf of the Department of Energy.

To drill well number 108A, Big Chief used their rig number 35, equipped with a 136–foot Lee C. Moore derrick, with a hook load capacity of 1,025,000 pounds, a Lee C. Moore substructure with an 800,000 pound rotary and set back capacity, and a National 110 draw works, powered by three Waukesha 7040 800–horsepower engines. Mud circulation was accomplished by Emsco F–1300 and Gardner Denver PU–9 pumps.[10]

Big Chief operated its drilling rigs in three eight-hour shifts per day, known as "tours." A rig crew, commonly referred to as "roughnecks," consisted of a driller,[11] a derrickman, a motorman, and two floormen. Each rig crew worked an eight-hour tour. Overseeing the hourly work by the rig crew were the rig superintendents or "tool pushers." [12] Big Chief assigned two tool pushers to well number 108A.[13] Each

11. A driller is the chief of the crew that drills an oil or gas well. Wells are usually drilled continuously on *three eight-hour shifts called "tours,"* and a driller is in charge of each crew and is responsible for carrying out the orders of the geologist, tool pusher or other person supervising the well.

12. The tool pusher is the general supervisor of drilling operations in the field, who has subordinate to him the drilling crews of at least one well, and often a number of wells. He is responsible for seeing that drilling is properly and diligently performed and that supplies and equipment are on hand when needed.

13. The tool pushers on well number 108A were Gary Worden and Johnny Pollard.

tool pusher worked twelve-hour shifts and reported directly to Big Chief's project manager/drilling engineer, Richard Householder. Big Chief's IADC–API Official Daily Drilling Reports [14] were prepared by the drillers at the end of their shifts.[15] The tool pusher signed these reports at the end of each twenty-four hour period of operations.

WELL HISTORY

On June 9 and 10, 1983, before Big Chief's drilling rig was moved onto the well pad at site number 108A, a 42–inch outside diameter (O.D.) conductor casing [16] was pile driven to a depth of 153 feet. After the 42–inch conductor casing was in place, Big Chief moved their drilling rig onto the well pad, and, on June 17, 1983, the well was spudded in with a 12¼ inch bit. On June 18, 1983, a pilot hole was drilled to a depth of 342 feet. The drill string was then removed from the hole, and Gearhart Industries, Inc., the plaintiff's logging company, was rigged to log the hole. The initial attempt at logging the hole failed because the equipment would not go below a depth of 166 feet. Therefore, the logging equipment was pulled from the hole and, with a 12¼ inch bottom hole assembly, Big Chief ran a "wiper trip" to 342 feet to clear the hole. After running a directional survey, Big Chief pulled out of the hole and laid down the bottom hole assembly, replacing it with a 12¼ inch drilling assembly. Drilling continued from 342 feet to 382 feet where fresh water drilling fluid was circulated to clean the hole. Big Chief then removed the drill string.

On June 19, 1983, Gearhart was rigged up again and ran a Borehole Compensated Sonic Log, Dual Induction Laterlog, Self–Potential Log, Gamma Ray Log, Compensated Density Log, Compensated Neutron Survey and an X–Y Caliper Log. Interpre-

**14.** The International Drilling Contractor's Association, in association with the American Petroleum Institute (IADC–API), created the IADC–API Official Daily Drilling Report Form for drillers to use on the drilling rig to record information regarding the drilling sequence. This system of recording drilling events allows the driller to keep an accurate record of the drilling of the well.

**15.** A driller's log or tour sheet is a record, kept by the driller, that is supposed to show the following: when the well was spudded in, the size of the hole, the drilling tools used, when and at what depth the different drilling tools were hooked on, the number of feet drilled each day, and the point at which each string of casing is landed. In addition, any unusual events are to be noted in the log.

**16.** Casing is heavy steel pipe used to seal off fluids from the hole or to keep the hole from caving in. There may be several strings of casing, one inside the other, in a single well. The joint exhibits include a diagram titled "Casing Profile," which depicts the casing profile at the conclusion of the project. It is useful as a pictorial guide, to be used in conjunction with this Opinion.

Generally, surface casing is installed in a well bore after the well has been drilled through the fresh water sands to the required depth and drilling fluid has been circulated through the hole. The casing string is then lowered into the hole and cement is injected into the hole and circulated up the annulus to the surface of the well.

Most oil wells are completed with two strings of cemented casing, the surface pipe and the production string. The surface pipe serves as conductor of the drilling fluid through loose, near-surface formations, during deeper drilling, protects potable water supplies, anchors blowout preventers for deeper drilling, and supports at the surface deeper casing strings when hung. The production string serves as a conduit to the surface for produced fluids and confines each fluid bearing zone to its native place. *See* Bugbee, "An Introduction to Oil Well Cement Technology," 16 Oil and Gas Compact Bull. 26 (June 1957).

Production casing is the series of steel pipe lengths, screwed or welded together and called the 'string,' through which the oil flows to the surface. Surface-casing is not the same as the production string. It usually is an outer casing or jacket of the string. One purpose of surface-casing is to prevent contamination of fresh water strata which have been penetrated and to seal off fluids from the hole. Another purpose is to prevent caving at the surface. Surface-casing is a tubular product lighter than the string. Sometimes, however, the production string itself serves as the surface-casing. Surface-casing may go down a thousand feet or more. *Harper Oil Co. v. United States*, 425 F.2d 1335, 1336 (10th Cir.1970).

The cementing of casing in the hole involves the introduction of cement between the casing and the wall of the hole which is allowed to harden, thus sealing off intermediate formations and preventing fluids emanating therefrom from entering the hole. *See Harper Oil Co. v. United States*, 425 F.2d at 1342.

tation of these geophysical logs indicated that the top of caprock was located at a depth of 352 feet. Big Chief's IADC–API Official Daily Drilling Report for well number 108A contains the following entry for June 19, 1983: "Top of caprock estimated at 356 ft. from cuttings and Geolograph. JBM 6/19/83." [17]

The hole was then opened to 36 inches in three stages; and, on June 23, 1983, The Western Company (Western), an oil field service company hired by Big Chief, cemented the 30–inch surface-casing at a depth of 365 feet. Cementing of the 30–inch casing string was completed on June 24, 1983. On June 25, 1983, after waiting twenty-four hours for the cement to set, the 30–inch casing was tested for 30 minutes at an initial surface pressure of 324.95 pounds per square inch absolute (psia), and a final surface pressure of 329.01 psia. The pressure tests were judged to be acceptable pursuant to the terms of the contract specifications, Section F, Part II, Specifications, and paragraph 12.4.[18]

Between June 24, 1983, and July 19, 1983, Big Chief drilled a 12¼ inch hole in well number 108A from a depth of 363 feet to a depth of 1860 feet. After removing the drill string from the hole, and rigging Gearhart, Borehole Compensated Sonic, Gamma Ray, Compensated Density, Compensated Neutron, and X–Y Caliper Logs were run from a depth of 1849 feet to a depth of 340 feet on July 20, 1983. The top of the salt was identified at a depth of 1650 feet, based on interpretation of the logs. However, the site geologist declared the logs to be of very poor quality because of a severely washed out hole. All logs were classified as unacceptable, and the decision was made to re-run the logs in two stages after the hole had been opened to 17½ inches. Gearhart was rigged down, and Big Chief ran back in the hole with a 17½ inch bit and opened the hole from 12¼ inches to 17½ inches, from 382 feet to 653 feet. There were no returns of salt-saturated drilling fluid.[19]

On July 21, 1983, Big Chief continued to open the hole from 12¼ inches to 17½ inches, from 653 feet to 690 feet. A directional survey was run at 669 feet. Big Chief regained full returns of salt-saturate drilling fluid at 682 feet, and the hole was opened from 12¼ inches to 17½ inches, from 690 feet to 783 feet, where returns were lost again. Big Chief continued to open the hole from 12¼ inches to 17½ inches, from 783 feet to 810 feet with no salt-saturated drilling fluid returns. A directional survey was run at 780 feet, and the hole was opened from 12¼ inches to 17½ inches, from 810 feet to 900 feet with no drilling fluid returns.

At 1600 hours on July 21, 1983, as Big Chief was opening a 17½ inch hole to 900 feet, the drill string became stuck.[20] After

---

**17.** The entry made in Big Chief's June 19, 1983 daily drilling report, quoted above, was made by Joseph Murray, a geologist employed by D'Appolonia Consulting Engineers, Inc., of Houston, Texas, a consultant to the defendant on the Big Hill project.

On December 19 and 20, 1983, after completion of well number 108A, Murray modified his opinion of the top of caprock from 356 feet to 352 feet, based upon the geophysical logs performed by Gearhart, Big Chief's logging service.

**18.** Paragraph 12.4 provides:

The contractor shall test the 30″ surface casing to 300 psi surface pressure with 9.0 to 9.5 ppg mud in the hole. This pressure is to be held for 30 minutes. Maximum decline is not to exceed 30 psi in 30 minutes. It will not be necessary to test the casing shoe.

**19.** Lost circulation is the loss of drilling mud, also known as drilling fluid, to the formation. Lost circulation usually occurs when a cavern or some extremely porous formation is encountered into which the drilling mud escapes without returning to the surface. Drilling fluid is initially pumped under high pressure down inside the drill pipe and through holes in the rotating bit. Full circulation of drilling fluids through the drill pipe to the bottom of the well and back to the surface for removal of drill cuttings is essential to the rotary drilling process. In addition to lubricating the bit and removing the cuttings from the hole, on its return to the surface, the drilling fluid cakes the well bore, sealing harmful formations, while protecting valuable ones, and creating support for the walls of the hole. *See Burger Drilling Co. v. Bauman,* 643 F.2d at 241, n. 1.

**20.** July 21, 1983, therefore, marks the beginnings of the plaintiff's claim interval in this case.

performing a set of surface jars,[21] Big Chief pulled the drill string out of the hole. Big Chief then removed the 17½ inch bit assembly and ran the hole with an open ended drill pipe to 1628 feet in the 12¼ inch hole.

On July 22, 1983, in an effort to cure the lost circulation problem, Big Chief's oil field service company, Western, mixed a Kotex lost circulation pill and spotted it at 1628 feet. Western then mixed and spotted a 100–sack cement plug at 1628 feet. Big Chief pulled out of the hole and waited for three hours for the cement to dry. Big Chief then ran an open ended drill pipe back into the hole to 1628 feet. Big Chief was unable to tag the pill and it could not circulate salt-saturated drilling fluid in the hole. Therefore, Big Chief placed four bundles of newspaper in the hole, picked up a 17½ inch bit and a set of jars and pushed the remaining paper to a depth of 365 feet. Big Chief then tried to circulate, but the newspaper pushed the rotary table upward out of its seat. The rotary table was reset, and the paper was reamed and pushed from 365 feet to 740 feet. Big Chief began pulling the string out of the hole, tripping the jars three times.

On July 23, 1983, after replacing a swivel which had broken while pulling out of the hole, Big Chief made a 12¼ inch bit and ran in the hole to 324 feet. An attempt at circulating drilling fluid in the hole failed, so the string was run to 500 feet. Another attempt at circulating drilling fluid failed. Big Chief then pulled out of the hole, and picked up a 26–inch hole opener bottom hole assembly and ran in the hole to 363 feet. After washing and reaming from 363 feet to 382 feet with aerated mud, Big Chief opened the hole from 17½ inches to 26 inches from 382 feet to 420 feet. Although there were partial returns, the hole was very tight.

Big Chief continued opening the hole from 17½ inches to 26 inches from 420 feet to 457 feet on July 24, 1983. The hole continued to be very tight; therefore, Big Chief pulled the drill string out of the hole. Big Chief then ran back into the hole with a 12¼ inch bit and hit a bridge at 426 feet. The equipment was pulled out of the hole, and Gearhart was rigged up to run a temperature log. After Gearhart completed its log, Big Chief ran back into the hole with an open ended drill pipe to 350 feet, and Western mixed and spotted another 100–sack cement plug. After waiting for 3½ hours for the cement to dry, Big Chief ran back in the hole with 12¼ inch bottom hole assembly and tagged cement at 347 feet. Big Chief drilled to 366 feet where all returns of salt-saturated drilling fluid were lost. The equipment was again pulled out of the hole.

On July 25, 1983, after awaiting instructions, the drilling crew ran back into the hole with an open ended drill pipe to 357 feet and performed a Bradenhead cement squeeze job.[22] After waiting on the cement for twelve hours, Big Chief ran back in the hole with a 12¼ inch bit assembly and tagged cement at 317 feet. Big Chief then drilled a 12¼ inch hole in cement from 317 feet to 365 feet and washed from 365 feet to 451 feet.

Big Chief continued washing from 451 feet to 464 feet on July 26, 1983. After pulling the 12¼ inch assembly out of the hole, Big Chief rigged 17½ inch assembly and ran back in the well, opening the hole from 12¼ inches to 17½ inches, from 311 feet to 421 feet. Big Chief pulled out of

---

**21.** Jars is a method used to free a stuck drill string, involving hammering on the drill pipe to break it loose.

**22.** A cement squeeze job has been defined as a technique designed to seal off a part of a well hole where a leak exists to permit introduction of a sealing agent. By the use of a packer, part of the hole is sealed off and then cement slurry under high pressure is forced into the fracture for hardening as a permanent closure. *See Rorem v. Halliburton Oil Well Cementing Co.,* 246 F.2d 427 (5th Cir.1957). Or otherwise stated, a squeeze job is an operation designed to force cement up onto the outside of the casing to shut off leaks. After a squeeze job it is necessary that the cement be drilled from the hole, preferably by a light drilling machine known as a spudder. *See Wilson v. Holm,* 164 Kan. 229, 188 P.2d 899, 902 (1948). *See also Birch v. Virden Drilling Co., Ltd.,* 23 W.W.R. 673 (Manitoba Queen's Bench 1957) (a squeeze job is a method whereby perforations and fissures in well walls may be sealed off).

the hole again and picked up a 12¼ inch assembly, then ran back in the hole and washed and reamed from 464 feet to 545 feet. After repairing a plug in the bit, Big Chief continued to wash and ream from 513 feet to 545 feet. At 545 feet, Big Chief circulated salt-saturated drilling fluid and conditioned mud. The equipment was then pulled out of the hole and the 12¼ inch bit assembly was replaced by a 26–inch bit assembly. Big Chief ran back in the well and opened the hole from 17½ inches to 26 inches, from 315 feet to 457 feet, and then pulled back out of the well.

On July 27, 1983, Big Chief ran back in the hole with an open ended drill pipe and washed from 465 feet to 538 feet. Sand was falling into the hole while washing, so Big Chief pulled the drill pipe into the 30–inch casing and waited on Western. After rigging Western, Big Chief ran back into the hole and completed another Bradenhead cement squeeze job.

On July 28, 1983, after waiting on the cement for 16½ hours, Big Chief ran back in the hole with a 12¼ inch bit assembly and tagged cement at 353 feet. Big Chief drilled cement from 353 feet to 449 feet, then pulled out of the hole to change drilling equipment. Big Chief ran back in the hole with a 12¼ inch bottom hole assembly and circulated and conditioned mud with the bit on top of the cement plug at 449 feet. After circulating mud, Big Chief continued drilling cement from 449 feet to 475 feet, then washed out sand and ratty cement from 475 feet to 568 feet. Big Chief then circulated salt-saturated drilling fluid in the hole and attempted to clean the hole for 2½ hours. Big Chief continued to wash and circulate from 568 feet to 637 feet, after which the drill string was pulled from the hole.

On July 29, 1983, after picking up a 17½ inch hole opener assembly, Big Chief ran back in the hole to 355 feet. Big Chief reamed the hole from 355 feet to 475 feet, and washed and opened the hole from 12¼ inches to 17½ inches, from 475 feet to 637 feet, with full drilling fluid returns. Big Chief then pulled out of the hole and attached a 26–inch bit assembly and ran back

in the hole, washing and reaming the hole from 17½ inches to 26 inches, from 355 feet to 375 feet, with full drilling fluid returns. Big Chief again pulled the equipment out of the hole and picked up a 12¼ inch bit assembly. Big Chief ran back in the hole and washed and reamed the hole to 12¼ inches, from 637 feet to 760 feet, with full drilling fluid returns.

Big Chief continued reaming and washing the hole with the 12¼ inch bit assembly from 760 feet to 772 feet, with full drilling fluid returns on July 30, 1983. Drilling fluid returns were lost at 773 feet. In an effort to regain returns, Big Chief moved the drill pipe up and down in the hole and tried to circulate salt-saturated drilling fluid with no success. Big Chief then dry drilled from 773 feet to 792 feet, where the drill pipe became lodged in the hole. Big Chief was able to jar the drill string free with a set of jars, and then began to pull the string from the hole. The drill pipe was dragging up to 15,000 pounds above the normal weight to a depth of 582 feet, where the string moved freely again in the hole. Big Chief ran back in the hole with an open ended drill pipe to 640 feet and washed the hole to 880 feet, with no drilling fluid returns. Big Chief continued to wash the hole to 1212 feet, with no drilling fluid returns. After the hole became tight at 1212 feet, Big Chief pulled the string from the hole and attached a 12¼ inch bit and ran back in the hole. The drill string hit a bridge inside the 30–inch casing at 314 feet. Big Chief drilled out the bridge, with no drilling fluid returns.

On July 31, 1983, Big Chief washed and reamed the hole from 314 feet to 695 feet. After building up mud volume, Big Chief continued to wash from 696 feet to 977 feet. At 977 feet another bridge was encountered, but Big Chief drilled ahead to 1023 feet. Big Chief pulled the string from the hole and attached a new 12¼ inch bit assembly and ran back in the hole and washed and reamed from 1023 feet to 1663 feet with no drilling fluid returns. At 1663 feet, Big Chief spotted a 40–barrel gel and lost circulation pill then pulled out of the hole.

On August 1, 1983, Big Chief ran in the hole with an open ended drill pipe to 1524 feet. An attempt was made to wash downward, but the drill pipe would go no further. Big Chief pulled the drill pipe to 1492 feet, and Western mixed and spotted another 100–sack cement plug. The string was pulled from the hole, and Big Chief waited on the cement for 4½ hours. Big Chief ran back in the hole with an open ended drill pipe, but the drill pipe would not go below 351 feet. Big Chief pulled the pipe from the hole, and attached a 12¼ inch bit assembly and ran back in the hole, washing out sand from 292 feet to 380 feet. After building up mud volume, Big Chief continued to wash and ream the hole from 380 feet to 660 feet. The string was then pulled out of the hole and the 12¼ inch bit assembly was removed. Big Chief ran back in the hole with an open ended drill pipe to 620 feet. Western mixed and spotted a 150–sack cement plug at 620 feet, and the pipe was pulled from the hole. After waiting on the cement for 3½ hours, Big Chief ran back in the hole and attempted to circulate salt-saturated drilling fluid with no success. Big Chief pulled the pipe to 496 feet and Western spotted another 150–sack cement plug. The pipe was then pulled from the hole.

After waiting on the cement for 4½ hours, on August 2, 1983, Big Chief ran back in the hole with the open ended drill pipe and tagged a bridge at 351 feet. Big Chief washed out fresh water sand from 351 feet to 363 feet, with full drilling fluid returns, then pulled the pipe from the hole. Big Chief ran back in the hole with a 12¼ inch bit assembly and drilled sand from 363 feet to 366 feet. Returns of drilling fluid were lost at 366 feet, therefore, Big Chief pulled the string out of the hole. Big Chief ran back in the hole with an open ended drill pipe and washed from 361 feet to 374 feet. At 374 feet, Western attempted the third Bradenhead cement squeeze job with 650 sacks of cement. After the cement was pumped into the hole, however, there was no pressure, so no squeeze job was possible. Therefore, Big Chief pulled the pipe from the hole.

After waiting on the cement for seven hours, on August 3, 1983, Big Chief ran in the hole with an open ended drill pipe and tagged fill in the 30–inch casing at 309 feet. The pipe was then pulled from the hole, and Big Chief attached a 12¼ inch bit assembly. Big Chief ran back in the hole and drilled cement from 309 feet to 403 feet with full drilling fluid returns. After performing a pressure test on the well, Big Chief discovered there was a leak in the hole. Big Chief attempted to seal the leak by pumping 32 barrels of mud into the hole, nevertheless, there was still a leak. Big Chief pulled out of the hole and removed the 12¼ inch bit assembly and ran back in the hole with an open ended pipe to 371 feet. Western performed another Bradenhead cement squeeze job with 600 sacks of cement. After waiting on the cement for seven hours, Big Chief ran back in the hole and tagged cement at 353 feet. Big Chief pressured up to 160 pounds per square inch gauge (psig) on the casing and recorded an unacceptable pressure loss. Big Chief pulled out of the hole and attached a 12¼ inch bit assembly, then ran back in the hole and drilled cement from 353 feet to 400 feet. Salt-saturated drilling fluid was circulated in the hole with full returns while waiting on orders.

On August 4, 1983, Big Chief attempted to pressure test the 30–inch casing. Two tests resulted in unacceptable pressure loss in the casing. After completing the pressure tests, Big Chief drilled a 12¼ inch hole in cement from 400 feet to 644 feet. Big Chief then pulled out of the hole and changed equipment. As Big Chief ran back in the hole, the drill string hit a bridge at 349 feet. Big Chief broke through the bridge and ran in the hole to 644 feet where salt-saturate drilling fluid was circulated with full returns.

On August 5, 1983, Big Chief drilled a 12¼ inch hole from 644 feet to 659 feet. Salt-saturate drilling fluid was circulated in the hole for 2½ hours as the crew waited on orders. Big Chief pulled out of the hole, then ran back in the hole with an open ended drill pipe to 658 feet. Western mixed and spotted another 150–sack cement plug, and then pulled from the hole.

Big Chief attached a 17½ inch hole opener and ran back in the hole, opening the hole from 12¼ inches to 17½ inches, from 313 feet to 380 feet.

Big Chief continued to open the hole from 12¼ inches to 17½ inches, from 380 feet to 470 feet, on August 6, 1983. After circulating salt-saturated drilling fluid in the hole, Big Chief pulled the string out of the hole and changed the 17½ inch hole opener attaching a 17½ inch bit assembly. Big Chief ran back in the hole and drilled cement with full drilling fluid returns from 470 feet to 572 feet. On August 7, 1983, Big Chief opened the hole from 12¼ inches to 17½ inches, drilling in cement from 572 feet to 737 feet.

On August 8, 1982, Big Chief continued opening the hole to 17½ inches, from 737 feet to 771 feet, where drilling fluid returns were lost. Big Chief pulled two stands of drill pipe (approximately 180 feet), built mud volume, and ran back to the bottom of the hole and drilled a 17½ inch hole in cement from 771 feet to 780 feet, with no drilling fluid returns. After making some repairs to the drilling equipment, Big Chief drilled from 780 feet to 900 feet and opened the hole from 12¼ inches to 17½ inches, from 900 feet to 936 feet. The hole was sloughing in from 800 feet to 936 feet. Big Chief pulled the string from the hole and rigged Gearhart to run a temperature log. Gearhart was able to log from 365 feet to 530 feet, however, the instruments would not go below 530 feet.

On August 9, 1983, Big Chief rigged down Gearhart and ran in the hole with a 17½ inch bit assembly. The string hit a bridge at 364 feet; therefore, the crew pulled the string out of the hole and awaited orders. Big Chief ran back in the hole and reamed out the bridge at 364 feet. Big Chief washed and reamed to 530 feet, where the string tagged the fill. The string was then pulled out of the hole, and, after Western arrived, Big Chief ran back in the hole with an open ended drill pipe, hitting a bridge at 450 feet. Big Chief washed to 540 feet with the open ended drill pipe, and then pulled the string back to 50 feet. Western spotted a 100–sack

cement plug, and Big Chief pulled out of the hole. Big Chief then ran in the hole with an open ended drill pipe to 372 feet. Western performed another Bradenhead squeeze job with 1000 sacks of cement, and Big Chief pulled the pipe from the hole.

After waiting on the cement for eleven hours, on August 10, 1983, Big Chief tested the casing and cement plug. Following the pressure test, in which five psig were lost in five minutes, Big Chief ran back in the hole with an open ended drill pipe and tagged fill at 310 feet. The pipe was pulled from the hole, and Big Chief ran back in the hole with a 12¼ inch bit assembly and washed and reamed from 310 feet to 375 feet. Big Chief cleaned the hole by circulating salt-saturated drilling fluid, then pulled out of the hole and removed the 12¼ inch bit assembly. Big Chief ran back in the hole to 341 feet with an open ended drill pipe and applied pressure on the casing, but the casing would not hold more than 40 psig. A Bradenhead cement squeeze job was applied with 40 barrels of lost circulation material, followed by 1000 sacks of cement. The final Bradenhead squeeze pressure was 200 psig. Big Chief closed the top-out of the Bradenhead valve with a pressure of 200 psig applied to the drill pipe. This was the sixth Bradenhead cement squeeze job performed on well number 108A.

On August 11, 1983, after waiting on the cement for 10½ hours, Big Chief ran back in the hole with an open ended drill pipe and tagged cement at 312 feet, then pulled out of the hole. Big Chief attached a 26–inch bit assembly and ran back in the hole to 312 feet. Big Chief drilled a 26–inch hole in the cement from 312 feet to 362 feet.

On August 12, 1983, Big Chief pulled the string out of the hole and removed the 26–inch bit assembly and awaited orders. Big Chief then rigged a 17½ inch hole opener with a 12¼ inch pilot bit assembly and ran back in the hole, center punching the hole from 362 feet to 397 feet, with full drilling fluid returns. The string was pulled from the hole and Big Chief ran back in the hole with a 17½ inch bit assembly, drilling in

cement from 395 feet to 461 feet, with full drilling fluid returns. Big Chief broke through the cement at 576 feet and lost circulation. Big Chief ran on in the hole to 905 feet and tried to circulate salt-saturated drilling fluid with no success. The string was pulled out of the hole to the 30-inch casing, and Gearhart was rigged to run a temperature survey. The survey revealed a thief zone [23] at 712 feet.

On August 13, 1983, Big Chief ran in the hole with an open ended pipe to 688 feet. Western mixed and spotted a 100-sack cement plug, and Big Chief pulled out of the hole and waited on the cement for four hours. Big Chief ran back in the hole and tagged cement at 688 feet. Big Chief then pulled the string and attached a 17½ inch hole opener with a 12¼ inch pilot bit and ran in the hole and drilled cement from 688 feet to 703 feet with full drilling fluid returns. Big Chief washed and reamed from 703 feet to 910 feet and began losing mud. Big Chief continued to wash and ream the hole to 936 feet, then opened the hole from 12¼ inches to 17½ inches, from 836 feet to 1060 feet, but continued to lose mud.

On August 14, 1983, Big Chief continued to open the hole from 12¼ inches to 17½ inches from 1060 feet to 1067 feet and lost all drilling fluid returns. Big Chief pulled the string out of the hole and removed the 17½ hole opener then ran back in the hole with a 12¼ inch bit assembly to 1517 feet. Big Chief pulled the string and removed the 12¼ inch bit assembly and ran in the hole with an open ended drill pipe to 1498 feet. Western mixed and spotted a 100-sack cement plug and Big Chief pulled eight stands of drill pipe (approximately 720 feet) and attempted to fill the hole with salt-saturate drilling fluid, but had no success. Big Chief then pulled the remainder of the pipe out of the hole and rigged Gearhart to run a temperature survey. The temperature survey reveal thief zones at 500 feet, 750 feet and on the bottom at 1860 feet. Big Chief ran in the hole with an open ended drill pipe and tagged cement at 1446 feet. Big Chief pulled the pipe to

up to 1404 feet and Western spotted a 100-sack cement plug. Big Chief then pulled the string into the 30-inch casing to wait on cement.

After waiting on cement for 1½ hours, on August 15, 1983, Big Chief tried to fill the hole with salt-saturated drilling fluid. This attempt failed, therefore, Big Chief ran an open ended drill pipe into the hole to 1185 feet and Western spotted a 100-sack cement plug. Big Chief waited on the cement for four hours and tried again but could not fill the hole with salt-saturated drilling fluid. Big Chief ran in the hole to 1278 feet, and found no cement. The pipe, therefore, was pulled to 1185 feet, and Western spotted a 100-sack cement plug. Big Chief waited on the cement for 5½ hours and attempted to fill the hole with salt-saturate drilling fluid. Again, this attempt to fill the hole failed. Big Chief ran back in the hole and tagged cement at 981 feet. The pipe was pulled out of the hole to 686 feet, and Western mixed and spotted a 200-sack plug. Big Chief pulled out of the hole and waited on the cement for five hours. Big Chief ran back in the hole and attempted to tag the plug, however, there was no plug. After waiting for Western to bring more cement to the site, Big Chief ran back in the hole with an open ended pipe to 876 feet and Western spotted another 200-sack plug. Big Chief then pulled out of the hole.

After waiting on the cement for four hours, Big Chief again tried to fill the hole with salt-saturated drilling fluid on August 16, 1983. Once again, this attempt at filling the hole failed. Big Chief then ran back in the hole and tagged the cement plug at 977 feet. Western spotted a 400-sack cement plug, at 977 feet, and Big Chief pulled out of the hole and waited on the cement for 3½ hours. Big Chief pulled out of the hole and attached a 17½ inch hole opener with a 12¼ inch pilot bit assembly and ran into the hole to 642 feet and drilled cement from 642 feet to 1000 feet with full drilling fluid returns.

---

**23.** A thief zone or thief formation is a formation causing excessive drilling fluid loss in drilling operations. Such a formation may sometimes be sealed by the addition of various fibrous or flaky materials in the drilling fluid.

On August 17, 1983, Big Chief continued drilling cement from 1000 feet to 1007 feet with a 12¼ inch pilot bit on a 17½ inch hole opener. Big Chief pulled several stands of pipe and secured the rig for Hurricane Alicia, which was predicted to arrive shortly. Big Chief evacuated the site at 1400 hours.

Big Chief returned to the site and commenced operations at 1500 hours on August 18, 1992. After checking the equipment and clearing the hole, Big Chief continued drilling cement from 1007 feet to 1060 feet, losing small amounts of mud. On August 19, 1983, Big Chief continued drilling cement from 1060 feet to 1069 feet and lost all returns. The equipment was pulled out of the hole, and Big Chief ran in the hole with an open ended pipe to 1019 feet. Western spotted a 100–sack cement plug, and, after waiting on the cement for 4½ hours, Big Chief attempted to tag the plug. Big Chief was unable to locate the plug, therefore, it set the open-ended drill pipe to 1019 feet and Western spotted a 100–sack cement plug. Big Chief waited on the cement for 3½ hours, then tagged the plug at 950 feet. Big Chief filled the hole with salt-saturated drilling fluid, then pulled the pipe from the hole. Big Chief ran back in the hole with a 17½ inch hole opener with a 12¼ pilot bit assembly and drilled cement from 950 feet to 1012 feet. Total depth of the 17½ inch hole was 1067 at the end of the third shift on August 19, 1983.

On August 20, 1983, Big Chief continued drilling a 17½ inch hole in cement from 1012 feet to 1069 feet where drilling fluid returns were lost. Big Chief drilled dry from 1069 to 1100 feet then pulled the string out of the hole and removed the 17½ inch hole opener assembly. Big Chief ran back in the hole with an open ended drill pipe to 1030 feet where Western spotted a 200–sack cement plug. The pipe was pulled out of the hole, and, after waiting on the cement for four hours, Big Chief ran back in the hole and tagged the cement plug at 964 feet. Big Chief attempted to circulate salt-saturated drilling fluid in the hole with no success; therefore, the open ended drill pipe was pulled to 905 feet, and

Western spotted another 100–sack cement plug. After waiting on the cement for 3½ hours, Big Chief ran back in the hole and tagged the plug at 768 feet.

Big Chief tried to fill the hole with salt-saturated drilling fluid on August 21, 1983, but its initial attempt failed. Therefore, Big Chief mixed a 100–barrel lost circulation pill and spotted the pill from 768 feet up to 400 feet. Western then spotted a 100–sack cement plug at 468 feet. After waiting on the cement for 3½ hours, Big Chief ran back in the hole with an open ended drill pipe and tagged the plug at 393 feet. Again, Big Chief attempted to fill the hole with salt-saturated drilling fluid, with no success. The open ended drill pipe was pulled up to 341 feet, and Western spotted another 100–sack cement plug. Big Chief waited on the cement for 3½ hours, then it ran back in the hole with an open ended drill pipe and tagged the plug at 326 feet. After pulling the pipe from the hole and attaching a 17½ inch hole opener with a 12¼ inch pilot bit, Big Chief ran back in the hole and drilled cement from 326 feet to 783 feet.

On August 22, 1983, Big Chief continued to drill a 17½ inch hole in cement from 783 feet to 1023 feet. On August 23, 1983, the 17½ inch hole was extended through to the end of the cement at 1100 feet, and the hole was opened from 12¼ inches to 17½ inches from 1100 feet to 1167 feet. August 22, 1983, at 1200 hours, represents the end of the claim period.

Between August 23, 1983, and September 6, 1983, Big Chief opened a 26–inch hole in well number 108A to 1460 feet, a 17½ inch hole to 1653 feet, and a 12¼ inch hole to 1864 feet. On September 7, 1983, Big Chief extended the 12¼ inch hole to a depth of 1881 feet, then the drill string was pulled from the hole and Gearhart was rigged to run a new set of logs. The Borehole Compensated Sonic log was run from 1849 to 1440 feet, and, although the log was of poor quality, it was judged to be acceptable. The Compensated Density, Compensated Neutron, Gamma Ray, and X–Y caliper logs were run from 1846 to 1460 feet and were also of poor, but accept-

able quality. Based on interpretation of the geophysical logs, the top of the salt was located at a depth of 1650 feet, confirming the previous tentative identification of the top of salt made on July 20, 1983.

After confirming the location of the top of the salt on September 8, 1983, Big Chief worked for the next forty-five days to complete well number 108A. During that period of time, Big Chief cemented the 20-inch intermediate casing at 1859 feet. The Bradenhead was then welded to the 20-inch casing, and the Bradenhead and the 20-inch casing were pressure tested. Both tests produced acceptable results.

The hole was then extended with a 12¼ inch bit to a depth of 2145 feet, and a gyroscopic survey was run, geophysical logs were completed and side wall core samples were taken. Big Chief opened the hole to 17½ inches, and an X-Y caliper log was run. The 13⅜ inch casing was then cemented at a depth of 2129 feet and pressure tested for one hour. The pressure test results were judged to be acceptable. Big Chief then drilled the 12¼ inch hole to a depth of 2155 feet, where a casing seat test was performed for four hours. The test results were deemed to be acceptable.

Drilling at well number 108A was completed on October 15, 1983, when Big Chief extended the 12¼ inch hole to a total depth of 4732 feet. At the completion of drilling, the hole was underreamed from 12¼ inches to 15 inches from 2131 feet to 4732 feet, and a gyroscopic survey was run, geophysical logs were run, and side wall cores were taken. The log results show that the final well configuration was within the limits of the target zones specified in the contract.

Brine water was then used to displace the salt-saturated drilling mud in the hole, and the borehole was pressure tested for four hours. The borehole pressure test yielded acceptable results. The 10¾ inch casing was hung in the well at 2695 feet, and, on October 23, 1983, Big Chief installed the final sections of the wellhead and began moving the rig off well pad 108A.

There is no evidence in the record on which to base a finding that any of the problems at well number 108A were be-

cause Big Chief did not follow proper and generally accepted drilling practices. In fact, James Ford, the chief drilling inspector employed by the defendant's on-site contractor, Walk, Haydel & Associates, Inc., testified that Big Chief made a very prudent effort to construct the wells to contract specifications. In addition, Dr. Magorian, defendant's expert witness, agreed with the statement that "Big Chief has made a very prudent effort to construct the well to specifications," and further stated that he did not fault Big Chief for its drilling practices.

On December 4, 1983, Big Chief submitted a claim to DOE relating to well number 108A, in which Big Chief requested reimbursement in the amount of $906,525.93 for expenses allegedly incurred as a result of the alleged loss of the 30-inch surface-casing shoe and for expenses arising from problems with lost circulation. On June 14, 1984, Big Chief submitted a revised, certified claim in the amount of $646,801.77. The revised claim related only to the alleged loss of the 30-inch casing shoe and omitted the claim for lost circulation. On April 1, 1985, the contracting officer issued a decision denying Big Chief's June 14, 1984 claim.

## DISCUSSION

The plaintiff asserts that the defendant's liability in this action results from two factors. First, the plaintiff argues that, under contract specification 8.1.1, the defendant had the duty to determine and designate competent caprock. The plaintiff maintains that the defendant's on-site representatives had a duty to determine the location of competent caprock, and failed in this duty, thereby precluding the secure placement and cementing of a "casing shoe," which, the plaintiff argues, is an essential step in the completion of a cavern well.

Second, the plaintiff argues that the specifications set forth in the contract relating to the placement of the surface-casing were defective. The plaintiff's claim in relation to contract specification 9.3 is that this specification was defective because it established an imperfect range within

which the plaintiff was required to set and cement the 30–inch casing shoe/seat in order to establish a secure casing bond with competent caprock. This theory, the plaintiff asserts, has nothing to do with who determined the location of the caprock or whether the caprock determination was accurate under contract specification 8.1.1, and, therefore, constitutes a separate and distinct claim.

The plaintiff argues that the separate nature of these claims is demonstrated in several ways. First, the plaintiff asserts that the contract provisions address separate stages of the well construction. Under the plaintiff's interpretation of the contract, specification 8.1.1 is limited to the identification of caprock, and specifies the circumstances under which this identification shall occur. Contract specification 9.3, the plaintiff urges, provides the specific design criteria which a contractor must follow in placing the 30–inch casing shoe after the caprock has been identified pursuant to contract specification 8.1.1.

The plaintiff's amended complaint also frames these claims alternatively and provides that the difficulties encountered during drilling were the direct result of (i) the defendant's failure to identify competent caprock accurately, and (ii) defective specifications regarding placement of the 30–inch casing. According to the plaintiff, by proving either of the theories it proposes, by a preponderance of the evidence, it should be entitled to recover damages from the defendant.

Defendant rejects plaintiff's claims and the factual and legal premises upon which the claims are based. Defendant maintains that the directions included in section 9.3 of the contract did not constitute a defective specification and were not responsible for the loss of the integrity of the casing shoe. Defendant also asserts that the government did not have an obligation to determine the top of caprock under contract provision 8.1.1, and that such responsibility rested with the plaintiff.

Defendant asserts that under a fixed price turnkey project, such as the one at issue, in which the differing site conditions clause of the standard general provisions of the contract is specifically deleted, and the site investigation clause remains in the contract, the risk of unanticipated difficulties, including the risk of subsurface or latent physical conditions different than those anticipated, should be on the contractor.

In the Opinion issued on the defendant's summary judgment motion filed in the above-captioned case, the court wrote:

> Defendant argues that the effect of the deletion [of the differing site conditions clause] was that plaintiff was to be responsible for all problems and costs arising from unforeseen subsurface conditions. Yet, it is interesting that in spite of this deletion, defendant attempts to classify the claim as a classic type I, differing site conditions claim. Defendant also claims that it sent a letter to all bidders explaining the effect of the deletion, but defendant cannot find the letter and plaintiff claims it never received any such letter. Plaintiff, on the other hand, contends that DOE did not advise bidders that deletion of the clause would result in the government's exculpation from all costs associated with lost circulation. Plaintiff further argues that the claim cannot be classified as a differing site conditions claim when there is no such clause in the contract.

*Big Chief Drilling Co. v. United States*, 15 Cl.Ct. 295, 302 (1988).

During the trial, the defendant was still unable to produce the referenced letter. Moreover, defendant no longer argues that plaintiff's claim should be classified as a differing site conditions claim. Defendant continues to argue, however, that the deletion of the differing site conditions clause placed the risk on the contractor of any problems resulting from subsurface conditions, such as the quality of the caprock.

The court agrees with plaintiff that Big Chief's claim is premised on breach of contract arising out of defective specifications and on the failure of the defendant to meet its responsibilities under the contract. It is not based, as defendant would seem to suggest, upon lost circulation, or upon un-

anticipated natural subsurface conditions found at the site. As testified to at trial by William Glass, president of Big Chief Drilling Company, the general lost circulation claims already were dropped from the claim before the contracting officer, and were not brought before this court.

Although the deletion of the differing site conditions clause did place certain risks on the contractor in this fixed price turnkey contract, the government is not relieved from the responsibilities it assumed under the contract. As is discussed below, the government remains responsible for the warranties attendant with the issuance of the design specification included in contract specification 9.3, and for the design specification which derived from the defendant's responsibility under contract specification 8.1.1 to determine the depth of the caprock.

Breaches by the government of duties freely assigned to the defendant under the contract, as signed, entitles a contractor to recover for damages attributable to those breaches. The additional expenses incurred by plaintiff in the instant case were not caused by unanticipated site conditions, but rather as a result of government direction to set the casing shoe in a 36–inch hole from surface to 15′ +/− 5′ into the caprock, and the faulty determination of the appropriately designated government official that the top of caprock was "estimated at 356 feet."

I. *Contract Specification 9.3*

The plaintiff maintains that regardless of whether the defendant had the obligation to designate caprock or whether such designation by the government's on-site representative was proper, the specifications set forth in the contract relating to the surface-casing were defective. The language concerning placement of the surface-casing in contract specification 9.3 reads as follows:

> *Surface Casing:* The Contractor shall run and set 30″ O.D., grade B casing in a 36″ hole from surface to 15′ +/− 5′ into the caprock. On the bottom 40″ casing joint, weld a stab-end float collar on the top and a guide shoe on the bottom.

The government does not dispute that the plaintiff complied with the terms of contract specification 9.3 by setting the 30–inch casing shoe at 365 feet. The plaintiff argues that, notwithstanding their compliance with contract specification 9.3, the casing shoe was not set deep enough into the caprock to insure a competent casing seat because specification 9.3 established a defective range within which Big Chief was required to set and cement its 30–inch casing shoe/seat in order to try to establish a secure casing bond with competent caprock.

The plaintiff's claim based upon contract specification 9.3 is that this specification was defective and that such defect caused the loss of the integrity of the casing shoe. The law is clear that the government warrants design specifications, and if such specifications are deficient, the government bears the risk. *Neal & Co. v. United States,* 19 Cl.Ct. 463, 467–68 (1990), *aff'd,* 945 F.2d 385 (Fed.Cir.1991). The theory of implied warranty for government design specifications was recognized early by the United States Supreme Court in *United States v. Spearin,* 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918). In *Spearin,* the Court upheld a judgment against the United States noting that: "if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." *Id.* at 136, 39 S.Ct. at 61. Since the *Spearin* decision in 1918, courts have recognized the principle that design specifications contain an implied warranty that if they are followed an acceptable result will be produced. *Blount Bros. Corp. v. United States,* 872 F.2d 1003, 1007 (Fed.Cir. 1989); *Stuyvesant Dredging Co. v. United States,* 834 F.2d 1576, 1582 (Fed.Cir.1987); *Ordnance Research, Inc. v. United States,* 221 Ct.Cl. 641, 670–71, 609 F.2d 462, 479–80 (1979); *R.E.D.M. Corp. v. United States,* 192 Ct.Cl. 891, 902, 428 F.2d 1304, 1310 (1970); *J.L. Simmons Co. v. United States,* 188 Ct.Cl. 684, 690–91, 412 F.2d 1360, 1362 (1969); *Sterling Millwrights, Inc. v. United States,* 26 Cl.Ct. 49, 84

(1992); *Wm. T. Thompson & Co. v. United States*, 26 Cl.Ct. 17, 24 (1992); *Mega Constr. Co. v. United States*, 25 Cl.Ct. 735, 743 (1992). As stated in *Concrete Placing Co. v. United States:* "In exchange for the right to direct specifically how a project shall be performed, the government warrants that its directions are not defective." *Concrete Placing Co. v. United States*, 25 Cl.Ct. 369, 375 (1992).

The contractor in the instant case has claimed entitlement to additional compensation, due to a government issued defective design specification. Design specifications set forth in detail the materials to be employed and the manner in which the work is to be performed, and the contractor is "required to follow them as one would a road map." *J.L. Simmons Co. v. United States*, 188 Ct.Cl. 684, 689, 412 F.2d 1360, 1362 (1969). Whereas, performance specifications simply set forth an objective or end result to be achieved, and the contractor may select the means of accomplishing the task. *Id.* at 689, 412 F.2d at 1362. *See also Concrete Placing Co. v. United States*, 25 Cl.Ct. at 374. In general, in order for a contractor to recover an equitable adjustment it must demonstrate that the specification is a design specification, not a performance specification, and that such design specification is defective or impossible to perform. *Concrete Placing Co. v. United States*, 25 Cl.Ct. at 374.

In *J.D. Hedin Construction Company v. United States*, the Court of Claims stated:

It is well settled that where the government orders a structure to be built, and in so doing prepares the project's specifications prescribing the character, dimensions and location of the construction work, the government implicitly warrants, nothing else appearing, that if the specifications are complied with, satisfactory performance will result. *E.g., United States v. Spearin*, 248 U.S. 132 [39 S.Ct. 59, 63 L.Ed. 166] (1918); *Laburnum Construction Corp. v. United States*, 163 Ct.Cl. 339, 325 F.2d 451 (1963); *Arcole Midwest Corp. v. United States*, 125 Ct.Cl. 818 [113 F.Supp. 278] (1953); *Stapleton Construction Co. v. United States*, 92 Ct.Cl. 551 (1940). This rule rests on the presumed expertise of the government where it sees fit to prescribe detailed specifications. *National Presto Industries, Inc. v. United States*, 167 Ct.Cl. 749, 758–59, footnote 6, 338 F.2d 99, 105 (1964), *cert. denied* 380 U.S. 962 [85 S.Ct. 1105, 14 L.Ed.2d 153] (1965).

*J.D. Hedin Constr. Co. v. United States*, 171 Ct.Cl. 70, 76, 347 F.2d 235, 241 (1965). *See also Ordnance Research, Inc. v. United States*, 221 Ct.Cl. 641, 609 F.2d 462 (1979) (the Court of Claims recognized the general principle that when the government issues design specifications of a detailed nature, it warrants the sufficiency and efficacy of the specifications to produce the desired results in a satisfactory manner; and, if such specifications prove defective, the government must compensate the contractor for the additional costs of performance.)

The defendant has not contested the "design" nature of the contract specifications in any of its pretrial filings, nor did it attempt to introduce evidence at the trial to refute this characterization. Design specification 9.3 prescribes in precise detail the requirements for the placement of the 30–inch surface-casing. This is shown not only by the language of specification 9.3, but also by Figure II.3 of the contract, which constitutes an "as built" drawing for the casing program.

The plaintiff asserts that contract specification 9.3 was defective because it failed to provide a zone within which the plaintiff could establish a sound, secure casing seat. William Glass, President of Big Chief Drilling, Richard Householder, the on-site project manager and drilling engineer for the plaintiff, and Gene Wiggins, Jr., Big Chief's expert witness, all testified in great detail concerning the problems encountered by the plaintiff in the area of the 30–inch casing. Likewise, James Ford, Jr., the chief drilling inspector employed by the defendant's on-site contractor, Walk, Haydel & Associates, Inc., testified to the problems encountered by the plaintiff in the area of the 30–inch casing, as well as to the

problems he believed existed with contract specification 9.3.

The history of contract specification 9.3 shows the problems encountered with the 15′ +/− 5′ requirement proscribed by that section. After denying the plaintiff's request for a blanket deviation from specification 9.3, Gary C. Landry, the contracting officer, did allow the plaintiff to set the 30-inch casing deeper in the final set of wells drilled under the contract. The uncontroverted testimony of Landry, the contracting officer, and Michrell Waggoner, the DOE contract specialist assigned to the Big Hill project, was that a deviation from the contract specifications would not have been granted without showing a "necessity." Joseph Murray, the on-site geologist employed by D'Appolonia Engineering Consulting Engineers, Inc., a subcontractor for Walk, Haydel & Associates, Inc., acknowledged at trial that "the Department of Energy changed 9.3 to grant a deeper setting of the casing shoe because 15 feet was not conducive to getting a suitable seal."

As a result of the experience on well number 108A, DOE allowed Big Chief to set the surface-casing up to 50 feet into the caprock on subsequent wells. The change for well number 109A was memorialized in a formal modification (M001) to the contract, issued by the contracting officer on June 20, 1983. Moreover, after the plaintiff's contract was completed, DOE entered into a subsequent drilling contract for additional wells in addition to those in the contract at issue, also at the Big Hill site, with Drillers, Inc. Contract specification 9.3 in the Drillers, Inc. contract, in fact, was changed by DOE to allow the contractor to set the 30-inch casing 100 feet into the caprock. The Driller's, Inc. contract was also changed to specifically state that the setting depth of the casing seat was to be determined by the contractor.

James Ford testified that this change was made because of the incompetency of the caprock and the fact that he was asked by DOE to make the recommendations to change the specification. Ford stated:

there was permission granted from Mr. Waterhouse on the wells to make sure we had it [the casing shoe] better down into the cap rock part. And then subsequently at the end of the contract, the Big Chief contract, before we went into the Driller's Inc. contract, this was discussed and put into the Driller's, Incorporated contract because of the incompetent cap rock on some of the areas of the Big Hill site. They increased the depth of the setting of the casings.

The plaintiff argues that the foregoing facts establish that contract specification 9.3 was defective. By following contract specification 9.3, the plaintiff appears to have lost the integrity of its casing shoe. No such problems arose after the DOE allowed the plaintiff to deviate from contract specification 9.3 at the Big Hill site on those wells drilled subsequently at the site by Big Chief or under the follow-on contract with Drillers, Inc.

One explanation the plaintiff advances to explain the government's initial hesitancy to allow the surface-casing to be set deeper in the wells at the Big Hill site is the fact that the government had a limited supply of casing to be used at Big Hill, and, under the contract, the casing was to be supplied by DOE. Householder, the on-site project manager for the plaintiff, testified that the government's representatives would not initially grant a blanket deviation because the government was short of casing which was stored at Bryan Mound, another Strategic Petroleum Reserve site, and that DOE's Waggoner had stated "we are not just going to give you a blanket deviation to use up all of this casing." Householder explained that the government had the 30-inch casing in storage at the Bryan Mound site and that they had it programmed out so that this 30-inch casing would supply all the wells at the Big Hill site. The importance of these facts, plaintiff maintains, is that if surface-casing is set deeper into caprock, more casing is required.

As a result, the plaintiff was not initially granted a blanket deviation, which would have included well number 108A. Instead, a blanket deviation was granted only after the problems experienced at well number 108A. The plaintiff asserts that had the

government been less concerned about the amount of casing in its supply at Bryan Mound, and more concerned about the successful completion of the wells under the Big Chief contract, the problems encountered in well number 108A could have been prevented, since a deeper setting depth for the 30–inch casing would have avoided the problems that the plaintiff confronted, and which are the subject of this lawsuit.

In the instant case, the plaintiff maintains it demonstrated that complying with the original contract specification 9.3 resulted in serious well completion problems and that a deeper setting depth alleviated the problems on the remaining wells drilled at the Big Hill site. Accordingly, the plaintiff argues the court should find that contract specification 9.3 was defective, allowing it to recover for additional compensation for the work performed.

One of the issues relating to contract specification 9.3 that the court specifically requested the parties to address in their post-trial filings is the significance of occurrences after the completion of well number 108A. As demonstrated by several of the design specification cases decided by the United States Claims Court and its predecessor, the United States Court of Claims, the consideration of subsequent occurrences is not only proper but many times necessary to determine whether a defective specification exists.

For example, in *R.E.D.M. Corp. v. United States*, 192 Ct.Cl. 891, 428 F.2d 1304 (1970), the court considered the successful production of fuses, which were generated after the contractor began operating under a changed specification. Initially the contractor had a high rejection rate during the production of artillery fuses. The contractor solved the problem by reducing the thickness of one of the components of the fuses. The court ruled in favor of the contractor because the design specifications were found to be defective. The court found that a defect existed even though the contractor could not pinpoint the defect or explain why the specification failed. It was enough that the original specification resulted in failure and a

change, achieved by trial and error, not academically explicable, produced favorable results. Likewise, in *Ordnance Research, Inc. v. United States*, 221 Ct.Cl. 641, 609 F.2d 462 (1979), the court considered evidence on production of explosives after an additional step had been incorporated into the original design specifications used in the production process. The fact that no further explosions occurred after the addition was made was an important fact utilized by the court to find that the contractor was entitled to recover based upon its defective specification claim. *Id.*, 609 F.2d at 480. In the instant case, successful drilling at the Big Hill site, which occurred after the drilling of well number 108A, and after the DOE had allowed specification 9.3 to be amended, reinforces the finding that contract design specification 9.3 was defective.

II. *Surface–Casing*

The defendant has taken the position in its pleadings, and through the evidence presented by several of its witnesses, that placement of the 30–inch casing into competent caprock is not a necessary step in the drilling and completion of a cavern well. The plaintiff, however, maintains that the evidence at trial showed that placement of the 30–inch casing was an essential step in the drilling of well number 108A at the Big Hill site. The plaintiff argues that the testimony of numerous witnesses, including several of the defendant's witnesses, demonstrates that the difficulties encountered at well number 108A were resolved by the modifications to specification 9.3, and resulted in the absence of drilling problems at the other wells at the Big Hill site.

Contract specification 9.3, under the contract as it related to well number 108A, required the plaintiff to set the surface-casing between 10 and 20 feet (*i.e.*, 15′ +/− 5″) into caprock. After the problems encountered by the plaintiff in the drilling of well number 108A, the government allowed Big Chief to set the surface-casing on subsequent wells up to 50 feet into the caprock. In addition, the subsequent contract at the Big Hill site which was award-

ed to Drillers, Inc., provided that the same casing be set up to 100 feet in the caprock. Contract specification 9.3 was written, modified, and latter rewritten, all in an effort to insure proper drilling and completion of the cavern wells. The government's position that specification 9.3 was not an important step in the well construction is inconsistent with the established, undisputed facts, including the revision of specification 9.3 for wells drilled at the Big Hill site subsequent to well number 108A.

In addition to the history of contract specification 9.3, the testimony of witnesses on both sides of the case confirm that the specification was necessary, essential, and, that the surface-casing served a critical purpose. William Glass, President of Big Chief,[24] testified that it is important to anchor the casing shoe into solid rock so the integrity of the well bore is protected. He also confirmed that the setting of the casing into the caprock is a critical function in terms of the preservation of the well.

Likewise, Richard Householder, the on-site project manager and drilling engineer for Big Chief, testified that "it is absolutely necessary that it [the casing shoe] be set in competent cap rock." He stated that if the casing shoe is not set in caprock, sand can enter the hole around the shoe, which will result in loss of the integrity of the shoe. Consequently, the drilling operations can be difficult, if not impossible, to sustain.

In a similar vein, the plaintiff's expert, Gene Wiggins, Jr., testified that the purpose of the casing shoe is to insure the integrity of the pipe string in order to protect the integrity of the well bore and to prevent the influx of extraneous fluids. Wiggins also testified that in the Gulf Coast region, this process is particularly important. Wiggins stated that:

> The most important thing in drilling a well is to land the casing and get it cemented. Prior to that time, any number of things can happen to you. Once you seal off the casing, then you have

ensured the integrity of the well bore to that point.

Even the government's witnesses confirmed that the surface-casing serves an important purpose in the drilling of a cavern well. James Ford, the chief drilling inspector employed by the defendant's on-site contractor, Walk, Haydel & Associates, Inc., described the purpose of the casing shoe as follows: "If you don't have a good casing shoe or cement job around your casing shoe, when you drill out, you are going to lose all your fluid. It is as simple as that." He also stated that the significance of setting the shoe in dense caprock is to maintain a better cement job, and, that without such a setting, sand comes into the hole. Further, depending on the amount of sand, Ford testified that it could cause the well to cave in.

Joseph Murray, the on-site geologist employed by D'Appolonia Engineering Consulting Engineers, Inc., a subcontractor for Walk, Haydel & Associates, Inc., testified that the identification of competent caprock, in which you can set the casing shoe, is an essential step in the drilling of a cavern well. Murray also testified that he could not imagine a situation in which a contractor would want to set the casing shoe in noncompetent caprock. Further, he stated that the purpose of contract specification 9.3 was to establish a sound, solid casing shoe in competent caprock, and that the purpose of the subsequent changes in the specification 9.3 was to get a suitable seal, in order to keep sand and fresh water out of the hole.

Gary Landry, the contracting officer, testified that the purpose of the contract specification concerning placement of the surface-casing was to achieve a casing shoe that was set in a denser, more stable formation. Likewise, Donald Whittington, a technical advisor for the government at the Big Hill site, testified that one of the purposes of the surface-casing is to keep substances, such as sand and water, out of the well bore.

---

**24.** Initially hired as an engineer trainee (roughneck) in 1959, Glass advanced through the company as drilling engineer, drilling superintendent, operations manager, vice-president, and, for fifteen years prior to trial, president.

Based on the foregoing testimony, the overwhelming weight of the evidence in the instant case shows that one of, if not the, most important purpose of the surface-casing was to isolate the hole from the influx of the surrounding geologic formations. The defendant's attempt in its filing before this court to downplay the importance of this portion of the well design is not accepted by the plaintiff, defendant's own witnesses, or, by this court.

### III. *Contract Specification 8.1.1*

The plaintiff's other theory of liability is based upon contract specification 8.1.1. Contract specification 8.1.1 states as follows:

> 8.1.1 From a depth of approximately 15' into the caprock up to the 42" conductor pipe, run ISF/GR/FDC/SP/CNL & Sonic in Well A only.
>
> The depth to the top of caprock will be determined by:
>
> ● a decline in the rate of drill bit penetration, and
>
> ● cuttings which contain anhydrite, limestone or gypsum.
>
> Concurrence of these factors must be obtained from the Contracting Officer or his designated representative.

Pursuant to contract specification 8.1.1, the plaintiff claims that the government had the duty to determine the depth of caprock and that its on-site geologist failed to accurately determine the depth of the caprock. As a result of this failure, the plaintiff asserts it encountered the loss of the integrity of the casing shoe. The defendant, however, argues that contract specification 8.1.1 addresses the contractor's responsibility to provide logging services, and that the specification only required that Big Chief obtain the "concurrence" of the contracting officer or his designated representative that the two "factors," (1) decline in the rate of drill bit penetration, and (2) cuttings which contain anhydrite, limestone or gypsum, for determining the depth of the top of caprock, were present. According to the defendant, contract specification 8.1.1 should not be read to impose a duty upon the government

to locate, identify, or designate caprock, or, to shift to the government the risk of a mistaken determination.

■ A contract is unambiguous when it is reasonably open to only one interpretation. *Framlau Corp. v. United States*, 215 Ct.Cl. 185, 194, 568 F.2d 687, 692 (1977). Only when the language of a contract is ambiguous will factors outside of the contract terms be taken into account. *See Sylvania Elec. Prods., Inc. v. United States*, 198 Ct.Cl. 106, 126, 458 F.2d 994, 1005 (1972). "[W]hen the terms of a contract are clear and unambiguous, there is no need to resort to extraneous circumstances, such as prior negotiations or custom of the trade for its interpretation." *Sea–Land Serv., Inc. v. United States*, 213 Ct.Cl. 555, 567, 553 F.2d 651, 658 (1977), *cert. denied*, 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978); *Northwestern Industrial Piping, Inc. v. United States*, 199 Ct.Cl. 540, 550–51, 467 F.2d 1308, 1314 (1972); *Perry & Wallis, Inc. v. United States*, 192 Ct.Cl. 310, 315, 427 F.2d 722, 725 (1970) (citing *Duhame v. United States*, 127 Ct.Cl. 679, 683, 119 F.Supp. 192, 195 (1954)).

Stated differently, a contract may be found to be ambiguous if the provisions under scrutiny reasonably may be interpreted in at least two ways. *Sun Shipbuilding & Dry Dock Co. v. United States*, 183 Ct.Cl. 358, 372, 393 F.2d 807, 815–16 (1968). Or, a contract is ambiguous when it sustains the interpretations advanced by both parties to the suit. *Avedon Corp. v. United States*, 15 Cl.Ct. 771, 776 (1988) (citing *Max Drill, Inc. v. United States*, 192 Ct.Cl. 608, 627, 427 F.2d 1233, 1245 (1970)); *Sun Shipbuilding & Dry Dock Co. v. United States*, 183 Ct.Cl. 358, 372, 393 F.2d 807, 815–16 (1968).

■ When interpreting the language of a contract, a court must give reasonable meaning to all parts of the contract, and not render portions of the contract meaningless. *Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed.Cir.1985); *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed.Cir.1983). Or, otherwise stated: "A basic rule of contract

interpretation is that 'a contract must be read as a harmonious whole with no words rejected or treated as meaningless.'" *Erwin v. United States*, 19 Cl.Ct. 47, 55 n. 5 (1989) (citing *Systems Exploration v. United States*, 8 Cl.Ct. 334, 337 (1985)).

■ The plaintiff argues that contract specification 8.1.1 is clear and unambiguous. This court agrees. In contract specification 8.1.1 the phrase "concurrence of these factors" refers to the two drilling events described in specification 8.1.1, not to any agreement or concurrence between Big Chief and the government. When read in its entirety, the sentence on "concurrence" means that the location of the top of caprock is to be determined by the government after its representative determines there has been both (1) a decline in the rate of drill bit penetration, and (ii) the appearance of cuttings containing anhydrite, limestone or gypsum.[25] When read in its entirety, the language of contract specification 8.1.1 is not susceptible to differing interpretations.

■ Even had the court determined that contract specification 8.1.1 was ambiguous, the rule of *contra proferentum* should operate, and the defendant should be held responsible for the ambiguity, since it drafted the contract specifications at issue. The doctrine of *contra proferentum* places the risk of latent ambiguity, lack of clarity, or absence of proper warning on the drafting party. The doctrine of *contra proferentem* mandates that:

> When the meaning of a provision is ambiguous and reasonable men could interpret the provision in different ways, the interpretation will be given to the document which is more favorable to the party who did not draft the provision.

*Tibshraeny Bros. Constr., Inc. v. United States*, 6 Cl.Ct. 463, 468 (1984) (citing *Thanet Corp. v. United States*, 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979); *Kenneth Reed Construction Corp. v. United States*, 201 Ct.Cl. 282, 289, 475 F.2d 583, 587 (1973); *Sturm v. United States*, 190 Ct.Cl. 691, 697, 421 F.2d 723, 727 (1970)). *See also Sun Shipbuilding & Dry Dock Co. v. United States*, 183 Ct.Cl. at 372, 393 F.2d at 815–16. Or, as stated by the United States Supreme Court, "as between two reasonable and practical constructions of an ambiguous contractual provision, such as the two proffered by the Government, the provision should be construed less favorably to that party which selected the contractual language." *United States v. Seckinger*, 397 U.S. 203, 216, 90 S.Ct. 880, 888, 25 L.Ed.2d 224 (1970). The doctrine of *contra proferentem* "'pushes the drafters toward improving contractual forms[,] and it saves contractors from hidden traps not of their own making.'" *Fry Communications, Inc. v. United States*, 22 Cl.Ct. 497, 503 (1991) (citing *Sturm v. United States*, 190 Ct.Cl. 691, 697, 421 F.2d 723, 727 (1970)).

The only requirement for applying the doctrine of *contra proferentem* is that the plaintiff's interpretation be reasonable. "[I]f 'the contractor follows an interpretation that is reasonable, this interpretation will prevail over one advance by the Government, even though the Government's interpretation may be a more reasonable one since the Government drafted the contract.'" *Neal & Co. v. United States*, 19 Cl.Ct. 463, 473 (1990) (quoting *United Pacific Ins. Co. v. United States*, 497 F.2d 1402, 204 Ct.Cl. 686 (1974)). In the instant case, under the facts presented, the plaintiff's interpretation is certainly reasonable. In fact, it is correct.

---

**25.** It is also interesting to note that the contracting officer, in his April 1, 1985 decision relating to Big Chief's claim, correctly acknowledges that the government's on-site geologist, Joseph Murray, had the duty to determine the location of caprock. For example, the contracting officer stated that "there is no evidence that the determinations made by the site geologist were improper." Also, in the same discussion, the contracting officer stated that "Mr. Murray's

determination *fulfilled the contractual obligation* to inform the contractor of the point at which caprock was encountered." (emphasis added). Rather than arguing that the government did not have such a duty, the contracting officer took the position that the performance of the determination by the government official was a proper government function under the contract.

Richard Householder, Big Chief's project manager, testified about the government's on-site geologist and his actions concerning the determination of caprock. First, Householder stated that it was clear to him that the contracting officer or his designated representative at the site would determine where the top of caprock was located. Regarding well number 108A, Householder testified that Ford, the chief drilling inspector employed by the defendant's on-site contractor, Walk, Haydel & Associates, Inc., contacted Joseph Murray, the on-site geologist employed by D'Appolonia Engineering Consulting Engineers, Inc., a subcontractor for Walk, Haydel & Associates, Inc., to notify him that the Big Chief was approaching caprock and that he should come to the site so that he could "call the top." Householder further testified that Murray came to the site, that he reviewed the geolograph drilling recorder and that he also drew samples from the shale shaker. After reviewing this information, Murray determined that Big Chief had reached caprock, and he entered his determination to that effect on the drilling report. He wrote: "Top of caprock estimated at 356 ft. from cuttings and geolograph. JBM 6/19/83." Therefore, based upon the actions of the government's on-site geologists, it is clear that persuasive evidence has been introduced supporting Big Chief's interpretation of contract specification 8.1.1 that it was the government's responsibility to determine the top of caprock, which responsibility it undertook to perform, albeit in a faulty manner.

The contracting officer's testimony, and the language of his written decision further support the court's finding that the government had the duty to determine the location of the caprock. The contracting officer's April 1, 1985 written decision states that "[t]here is no evidence that the determinations made by the site geologist were improper." When asked about this language, in light of the contract, Gary Landry, the contracting officer, stated "[w]ell, i'm afraid we used bad terminology in the Contract." However, the contracting officer's final written decision specifically states:

Since the contract utilizes the term 'caprock' as it is commonly understood in the industry, Mr. Murray's determination fulfilled the contractual obligation to inform the Contractor of the point at which caprock was encountered.

Therefore, the contracting officer, Landry, even as late as when he signed his final decision, clearly believed that the government had the duty to determine caprock. He stated without qualification that the government had a "contractual obligation" to identify caprock. In addition, it should be noted that there is nothing in the contracting officer's decision to suggest that the government did not have the duty to determine the top of caprock or to suggest that the determination of the top of caprock was the responsibility of the plaintiff.

The plaintiff further asserts that substantial evidence has been presented which demonstrates Joseph Murray's determination of the top of caprock was incorrect. Gene Wiggins, Big Chief's expert witness, testified that false caprock penetrated the interval of 356 to 362 feet. This opinion is contrary to Murray's top of caprock determination of 352 feet. Wiggins testified that from the dual induction lateral log, and from later logs run deeper in the hole, a sandy zone was located immediately below the casing. Wiggins noted that these logs indicate that this was an extremely porous and vulgar area, with large void spaces, and that, in his opinion, the logs indicated the top of dense caprock would be at 386 feet. Based upon the testimony offered by Wiggins, as well as the evidence on the failure of the casing shoe, the record supports the plaintiff's theory that Murray, the on-site geologist, an employee of D'Appolonia Engineering Consulting Engineers, Inc., a subcontractor of defendant's on-site contractor, Walk, Haydel & Associates, Inc., failed to identify competent caprock. Murray's failure to identify the top of caprock properly, therefore, constituted a breach of defendant's duty under the contract at issue, and plaintiff is entitled to be compensated for additional expenses incurred.

Alternatively, the incorrect determination as to the location of the top of caprock, which was "estimated at 356 feet" by the government representative, Murray, and entered as such into the drill log by him, can also be viewed as another government issued defective specification. Although the precise depth of the top of caprock was not part of the original specifications when the contract was signed, the determination of the top of caprock was included in the contract as one of the duties of the government.

The words "concurrence must be obtained from the contracting officer or his designated representative" clearly require that the ultimate determination as to the location of the top of caprock must be made by that appropriate government employee. Therefore, under the contract, even if the contractor had the initial responsibility to identify the top of caprock under the contract, the defendant's representative had the assigned and required task under the contract to make the determination as to the location of the top of caprock, or at the very least, ratify, adopt and promulgate that determination. Therefore, this court finds that not only was the failure to properly determine the top of caprock a breach of a duty under the terms of the contract on the part of the defendant, but the incorrect determination of the top of caprock by the government can be viewed as the government issuing another defective specification, which constitutes a breach of its duty to properly determine the top of caprock under contract specification 8.1.1. Therefore, the contractor, Big Chief, is entitled to be compensated for its damages.

## IV. *Loss of the Casing Shoe*

■ In addition to arguing that the surface-casing is not an important step in the construction of cavern wells, the defendant argues that the integrity of the casing shoe was not lost, and proposes the theory offered by Dr. Magorian, defendant's expert, that Big Chief might have drilled a hole in the side of the 30–inch casing, thus causing the problems described above at well number 108A.

Moreover, according to the plaintiff, throughout the case, the government has attempted to construe Big Chief's position to be that the entire shoe was lost or that the concrete portion of the shoe completely tore away from the formation and the casing. The plaintiff asserts this is not its contention. Rather, the plaintiff argues that the bond or seal between the concrete, the casing and the formation was impaired or failed (i.e., the integrity was lost), which allowed the entry of foreign matter into the hole.

The facts, as they occurred, are that first, the drill pipe became stuck in the hole on July 21, 1983. From a review of the drilling records, Gene Wiggins, the plaintiff's expert, indicated that this was due to sand entering the well bore around the casing seat. Wiggins testified that the plaintiff's logging reports indicate that as Big Chief was opening the hole, a tremendous amount of sand entered the well bore. He stated that the volume was enough so that Big Chief had to slow its pumps in order to allow the shale shaker to handle the extraneous material. He indicated that the logs reflect a very loose, unconsolidated area of sand and silt, and that this sand entered the hole subsequent to the rupture of the casing seat.

In addition to Wiggins' testimony, Big Chief's Richard Householder, who was on the Big Hill site and involved in its drilling operations on a daily basis, testified in great detail about the events surrounding the failure of the casing shoe. Householder stated that while opening a 17½–inch hole to 900 feet, the drill pipe suddenly became stuck. He also testified about a temperature log that was run by Gearhart Industries, which showed there was fluid moving into and out of the well bore at the point of the casing shoe. This temperature log was significant because if the casing shoe had been intact, these materials would not have been moving in and out of the well bore at the point of the shoe. Householder further testified that subsequently, when circulation was restored, Big Chief pumped huge volumes of sand out of the hole, and that two vacuum truck loads

which held 60 barrels each were hauled away from the site. After testifying about the measures used to combat these problems, Householder stated that the problem with the shoe was finally remedied after performing six Bradenhead cement squeeze jobs.

William Glass, president of Big Chief, testified that the problems with the casing in well number 108A had nothing to do with lost circulation, but rather were due to the casing seat giving way and allowing sand and water from behind the casing to intrude into the well bore. He testified that the intrusion of fresh water diluted the salt-saturated mud and prevented drilling operations from continuing without first repairing the casing seat.

Thomas Magorian, Ph.D., the defendant's expert witness, testified that he did not believe that the casing shoe was lost or failed. However, when questioned about whether the casing shoe failed or whether the integrity of the shoe was lost, Dr. Magorian stated that he did not know whether there was a loss of the integrity of the casing shoe, and he specifically limited his opinion to the theory that he did not believe the cement around the shoe was completely lost. Thus, at best, Dr. Magorian's testimony was extremely limited, and did not address the plaintiff's theory that the bond or seal of the casing shoe was broken or failed. Additionally, Dr. Magorian agreed that the Gearhart temperature log showed a temperature differential around the casing shoe. As Householder explained, a temperature differential in this area is significant because it shows the influx of extraneous matter into the hole. Further, Dr. Magorian admitted during cross-examination that Exhibit 1010E, upon which he relied, relates to the 13–inch casing, not to the 30–inch surface-casing. In fact, Dr. Magorian concluded his testimony by stating, "I stand corrected on that. This is the confusion."

As an alternative theory, under the assertion that the casing shoe was not lost, Dr. Magorian testified that Big Chief might have drilled a hole in the side of the 30–inch casing. Dr. Magorian's testimony regarding how the sand came to fall into the hole was based on the following:

I might say it's because of the way the drilling records were done without any mention of sand, so therefore it's difficult to prove anything from hereon. So, what I'm offering is I think a more rational explanation but I don't think I can ever be convinced from the records that we have in front of us. I'm not trying to make that claim.

Thus, Dr. Magorian's theory, by his own admission, is speculative, and based on his lack of knowledge about the volume of sand which entered the hole.

Dr. Magorian's testimony and theory regarding a potential hole in the casing shoe is called into question because of his admittedly incorrect review of key drilling records. For example, Dr. Magorian stated during his deposition, which was read into the record, in regard to his hole in the casing theory, that Big Chief forgot to drill a pilot hole for its 17½ inch hole opener. This omission, which he characterized at his deposition as an error, was the premise for his theory about a hole in the casing. At trial, however, Dr. Magorian admitted he was wrong. He stated that this was his "misunderstanding" and that "I missed the point that there was a pilot hole drilled." Dr. Magorian also agreed that he "looked at the records and misinterpreted them," rather than, as the government initially attempted to establish, he could not read the copies of the drilling records.

When other witnesses were questioned about Dr. Magorian's hole in the casing theory, the general consensus was that such a theory is not supported by the drilling records. Gene Wiggins, the plaintiff's expert, testified in detail about the type of hole opener used by Big Chief in the drilling of well number 108A, and stated that, in his opinion, Big Chief could not have, and did not, drill a hole in the side of the 30–inch casing. Moreover, Wiggins testified about pressure tests performed on well number 108A and stated that because of the results of such pressure tests, he does not believe that a hole had been drilled in the side of the casing.

James Ford, the chief drilling inspector employed by the defendant's on-site contractor, Walk, Haydel & Associates, Inc., also testified that based on his more than 25 years of drilling experience, "there's no way [Big Chief] could drill through that casing." Ford is not only a qualified driller, but, also was the government's "eyes and ears" at the site. He testified that he discussed drilling matters with Alvin Waterhouse, the contracting officer's technical representative during performance of the contract, virtually everyday. His basic job responsibility was to see that the contract was performed properly and the "the contractor adhered to the specifications of the contract on a 24–hour basis."

Furthermore, Big Chief's Richard Householder testified about pressure tests on the well, and he stated that these tests did not indicate there was a hole in the casing. Instead, the tests indicated that the integrity of the casing shoe had been lost and was not healed at the time of such pressure tests. In this regard, Householder stated:

> We had no reason to suspect that there was a hole in the casing. And the results of this pressure test show that that would have been impossible at this point. Casing that has a hole in it won't bleed down to 90 PSI, it will bleed down to zero instantly. You wouldn't be able to even pressure it up to 150 lbs.

Another flaw in Dr. Magorian's theory is his understanding of the hole opener that was used by Big Chief. Dr. Magorian testified that a drawing he created for his own use during his deposition, which was, subsequently, submitted as a trial exhibit, does not accurately depict the hole opener. Householder testified that the actual hole opener was covered with a housing, that the drilling cones faced downward, and that the outside was "smooth and flat." When asked about Dr. Magorian's drawing of the hole opener, Householder testified that "it doesn't even closely resemble the hole opener" that was used. The significance of this in regards to Dr. Magorian's theory is that there were no cutting areas pointed out toward the casing, which could have made a hole in the 30–inch casing.

Rather, the cutting areas were directed downward into the formation.

Therefore, based on the evidence discussed above, Dr. Magorian's theory concerning a hole in the 30–inch surface-casing is not supported in the record. The much more likely scenario, and the one which is supported by the record, is that the seal or bond around the casing failed, and this allowed sand and water to enter the well bore and disrupt Big Chief's drilling operations.

DAMAGES

In *Ramsey v. United States*, the Court of Claims enunciated a basic definition of damages allowable for a breach of contract:

> In actions for breach of contract the damages are ordinarily limited to the natural and probable consequences of the breach complained of, and the damages remotely or consequently resulting from the breach are not allowed....

> For a damage to be direct there must appear no intervening incident * * *; the cause must produce the effect inevitably and naturally, not possibly nor even probably. *Myerle v. United States, supra*, p. 27 [*Myerle v. United States*, 33 Ct.Cl. 1 (1897)].

*Ramsey v. United States*, 121 Ct.Cl. 426, 433, 101 F.Supp. 353, 357 (1951), *cert. denied*, 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed. 1369 (1952). *See also Olin Jones Sand Co. v. United States*, 225 Ct.Cl. 741, 742–43 (1980). Recovery of consequential damages requires proof that such consequence was foreseeable in the normal course of events, the loss in fact would have occurred, and the amount of the loss is susceptible to reasonable ascertainment. *Town of North Bonneville v. United States*, 11 Cl.Ct. 694, 726, *affirmed in part, reversed in part*, 833 F.2d 1024 (1987) (mem.), *cert. denied*, 485 U.S. 1007, 108 S.Ct. 1470, 99 L.Ed.2d 699 (1988). Speculative or uncertain losses, however, may not be recovered as a consequence of a breach of contract. *Id.* at 726; *Olin Jones Sand Co. v. United States*, 225 Ct. Cl. at 743.

■ Defective design specifications result in breach of an implied warranty accompanying government design specifications. Thus, if the warranty is breached, the plaintiff is entitled to recover monies expended in trying to comply with the defective specifications. *Sterling Millwrights, Inc. v. United States*, 26 Cl.Ct. 49, 84–85 (1992) (*citing Hol–Gar Mfg. Corp. v. United States*, 175 Ct.Cl. 518, 524–25, 360 F.2d 634, 638 (1966)); *Mega Construction Co. v. United States*, 25 Cl.Ct. 735, 743 (1992). Otherwise stated,

> If faulty specifications prevent or delay completion of the contract, the contractor is entitled to recover damages for the defendant's breach of implied warranty. *United States v. Spearin, supra; Warren Bros. Roads Co. v. United States*, 123 Ct.Cl. 48, 105 F.Supp. 826 (1952). Those damages extend to the costs incurred by reason of the idleness resulting from the mistakes in the plans. The defendant cannot, by errors in the specifications, cause delay in plaintiff's completion of the work and then compensate plaintiff merely by extending its performance time and by payment of any added direct cost occasioned by changes to correct those errors.

*Laburnum Constr. Corp. v. United States*, 163 Ct.Cl. 339, 350, 325 F.2d 451, 457–58 (1963). Thus, a plaintiff in seeking recovery because of defective specifications is not limited to an equitable adjustment for changes ordered to correct those mistakes. Defendant, in instances when a change is necessitated by defective specifications, must pay "the entire resulting damage without any deduction for time to make changes, as would be the case if the redesign were necessitated by a changed condition or the like." *Id., citing, Luria*

*Bros. & Co. v. United States*, 177 Ct.Cl. 676, 690, 369 F.2d 701, 709 (1966).

Legal textwriters, such as John Cibinic and Ralph C. Nash, when discussing how to assess damages in a defective specifications case, suggest that a constructive change can be found based on defective specifications. *Administration of Government Contracts* 335–37 (2d ed. 2d printing (1986). As they point out in the cited text, some factfinders have found the "change order" element to be satisfied by the government's refusal to recognize the defects, and by the government's insistence on performance in accordance with the specifications. Other cases, as described in the Nash & Cibinic text, seem to pass over the need to find either a direct or constructive change in order to trigger entitlement to damages under the Changes clause. These cases accept the principle that the contractors should be awarded the costs of attempting to cope with a defective specification from the inception of the contract, apparently on the theory that the change occurs at the inception of the contract.

In the instant case, the court chooses to award plaintiff damages based on theories of breach of contract.[26] In the case before the court, the failure of the government representative to properly define the top of caprock under contract specification 8.1.1 clearly constitutes a significant breach of the government's responsibilities under the contract. With respect to contract specification 9.3, this court finds that design specification 9.3 was defective and the issuance of that specification constitutes a significant breach of the implied warranty that if the contractor follows the government issued specification, a pro per result will ensue. Although requested by the contractor, no change was allowed to specification

---

**26.** In *Luria Brothers & Company v. United States*, 177 Ct.Cl. 676, 686–87, 369 F.2d 701, 707 (1966), the court awarded damages for a defective specification under a breach of contract theory. In that case arch column footings were poured at elevations other than according to the defective specification originally issued because the defective specifications misrepresented the bearing value of the material underlying the foundation of the structure at the prescribed elevations. In that case, the court discussed the breach as occurring because of the magnitude of the change, so as to constitute a cardinal change to the original contract. Therefore, according to the *Luria* court, a breach of the original contract occurred, essentially because the contractor performed work which was not the same work bargained for between the parties. *See also Edward R. Marden Corp. v. United States*, 194 Ct.Cl. 799, 809–10, 442 F.2d 364, 369–70 (1971).

9.3 for setting the casing shoe at 15 feet plus or minus 5 feet from the top of caprock. The contractor was forced to complete the work on well number 108A, using the defective specification, by making additional adjustments and taking numerous additional steps, detailed in this Opinion, in order to somehow accomplish its task at well number 108A.

CLAIM INTERVAL

At 1600 hours on July 21, 1983, as the plaintiff was opening a 17½ inch hole to 900 feet, the drill string became stuck in the hole. William Glass, president of Big Chief, testified that the casing seat gave way on July 21, 1983, allowing sand and water to intrude into the well bore. Richard Householder, the on-site project manager and drilling engineer for Big Chief at the Big Hill site, testified that from 3:00 p.m. to 4:00 p.m. on July 21, 1983, Big Chief was opening its 12¼ inch hole from 12¼ inches to 17½ inches. Householder further testified that:

> Thus, the next entry [in the IADC–API drilling log] is that we're working stuck pipe, which means we're stuck at 900 feet. At that time there was no way to know why we were stuck or what was sticking us, or what had happened. We just knew we were stuck.

After freeing the drill string from the hole on July 22, 1983, Big Chief made several unsuccessful attempts at healing an apparent lost circulation zone. Then, as Householder testified at trial:

> We made a bid trip into the hole—is that we knew of to combat the loss circulation, we were going to aerate our drilling fluid. By aerate what I mean is pump air into the fluid medium. The reason you do this is to reduce the hydrostatic pressure on the well bore. This is a Technique that Jim Form had told me about. It's a technique they had used on a job he was on where they had incurable loss circulation, and he said by doing this they were able to finally drill the wells. I was familiar with this technique because we had also used it in Oklahoma in weak zones.

What you can effectively do is reduce the hydrostatic head on the weak formation. So, we rig up with our air and mud and try to ream ahead. We go into the hole and circulate and find out that that's no good, because what's happening then is we're diluting the salinity of our mud. This is what led me to believe that the casing shoe had collapsed because I knew there was no fresh water sands in the gumbo up above the cap rock. So, I knew the fresh water could only be coming from one place.

I concurred with my people that this is what had happened. I called our home office, and I don't recall if I talked to Bill Glass or LeRoy Kenny at that time, but I spoke with one of them and told them what I thought had happened and they agreed.

The plaintiff's expert, Gene Wiggins testified in regards to the events of July 21, 1983, as follows:

Q Having reviewed the records in this case and the logs and the daily drilling records and done the preparation that you've told us about, could you tell the Court what, in your opinion, happened of any significance on this well on or about the 21st day of July, 1983?

A The well records indicate that on July 21 pipe was stuck in the hole. I believe it was two days after that that the occurrence of a sand bridge appeared on the drilling record. Subsequently, there were ten occurrences of sand bridges. This certainly caused the drilling contractor stress during that period of time of trying to determine the source of the sand bridge and trying to repair and keep extraneous material from coming into the well bore from behind the casing.

Q How did, in your opinion, sand get into the well bore?

A Well, in my opinion, sand has come in around the casing seat that failed.

Based on this testimony, as well as that of Glass and Householder, the court agrees with the plaintiff that for the purposes of calculating damages, the claim interval at

well number 108A began at 1600 hours on July 21, 1983.

As for the ending date of the plaintiff's claim interval, Householder testified that after the sixth cement squeeze job performed on August 10, 1983, the casing shoe was repaired. Big Chief's claim interval, however, encompasses the days from August 12 to August 22, 1983, because Big Chief was required to redrill portions of the hole that had previously been drilled, yet sloughed in due to the failure of the casing shoe. Householder clarified this portion of the plaintiff's claim during his redirect testimony:

Q ... I would like for you to explain to the court if you will why you consider the next day as those days from 8/14 on to 21 of the appropriate part of the claim interval.

A The reason we considered some days beyond that point—

Q Yes.

A —is because the failure of the casing shoe caused many problems within the hole other than just the loss of the shoe. It filled the hole with sand. It caused us to have to swap and surge the hole due to yo-yoing of the drill string. It caused other zones that had already been repaired to break down again.

We had gone in and repaired some zones. True we got back to a point we were, but there were still problems up above us that had not been completely cured yet to get back to the point they were prior to the loss of the shoe. So we still, even though we were down below it, we still had to come back up above us and do some remedial work to get us the kind of hole that we left when the shoe failed.

Based on the testimony offered at trial, as well as on an examination of the plaintiff's IADC–API drilling logs for well number 108A, the court concludes that the plaintiff's claim interval actually began at 1600 hours on July 21, 1983, and ran until 1200 hours on August 22, 1983, when the plaintiff was opening a 17½ inch hole to 900 feet. The appropriate number of hours encompassed by the plaintiff's claim interval is 739, which is computed as follows:

| | | |
|---|---|---|
| July 21, 1983 | (1600—2400 hours) | 8 hours |
| July 22–August 21 | (31 days × 24 hours) | 744 hours |
| August 22 | (0—1200 hours) | 12 hours |
| Total claim hours | | 764 hours |
| Less Hurricane Alicia evacuation hours | | − 25 hours |
| (August 17, 1983, 1400 hours until August 18, 1983, 1500 hours) | | |
| Claim hours determined by the court | | 739 Hours |

---

DAILY RIG RATE CALCULATION

Big Chief's computation of a daily drilling rate is set forth in plaintiff's exhibit 1011. William Glass, president of Big Chief, testified that the figures included in plaintiff's exhibit 1011 represent the damages that flowed from the failure of the casing shoe at well number 108A. Plaintiff's exhibit 1011 is a breakdown of the daily rig rate calculation as follows:

### RIG 35 DAYRATE CALCULATION

| COST CATEGORY | DAILY COST |
|---|---|
| 1. RIG LABOR | $1,269.94 |
| 2. LABOR BURDEN | 263.26 |
| 3. DIRECT SUPERVISION | 551.39 |
| 4. REPAIR AND MAINTENANCE | 1,332.73 |
| 5. DRILLING RECORDER RENTAL | 34.26 |

| COST CATEGORY | DAILY COST |
|---|---|
| 6. SINGLE SHOT RENTAL | 45.00 |
| 7. MONEL DC RENTAL | 60.00 |
| 8. FUEL | 795.48 |
| 9. INDIRECT SUPERVISION | 51.27 |
| 10. BOARD ROAD RENTAL | 682.99 |
| 11. RIG DEPRECIATION | 500.00 |
| 12. DRILL PIPE DEPRECIATION | 1,112.71 |
| 13. DRILL COLLAR DEPRECIATION | 150.00 |
| 14. RIG INSURANCE | 35.07 |
| 15. SITE OVERHEAD | 405.30 |
| 16. OKLAHOMA CITY OFFICE OVERHEAD | 1,136.63 |
| 17. HOUSTON CORPORATE OFFICE OVERHEAD | 367.42 |
| 18. YARD AND SHOP ALLOCATION | 1,821.05 |
| 19. MISCELLANEOUS TRUCKING | 57.24 |
| 20. QUALITY ASSURANCE/QUALITY CONTROL | 152.13 |
| 21. MISCELLANEOUS RENTALS | 825.05 |
| 22. BRINE WATER | 391.74 |
| 23. CUTTINGS DISPOSAL | 286.85 |
| 24. WATER DISPOSAL | 77.44 |
| 25. TESTING | 15.56 |
| 26. MECHANIC ALLOCATION | 218.39 |
| 27. FRESH WATER | 80.70 |
| 28. RISK | 357.36 |
| 29. BITS/REAMERS/STABILIZERS | 523.45 |
| 30. CEMENT PLUGS | 1,662.02 |
| 31. TEMPERATURE LOGS | 169.48 |
| DAILY RIG RATE | $15,431.91 |

BREAKDOWN OF COST CATEGORIES

1. RIG LABOR

Big Chief's daily cost figure for rig labor is $1,269.94/day. The defendant has not challenged, and the court adopts, the plaintiff's figures. This cost calculation is based on three five-man crews working eight hours per day, seven days per week. Each crew consisted of:

| 1 Driller | @ $11.22/hour |
|---|---|
| 1 Derrickman | @ $9.50/hour |
| 1 Motorman | @ $8.90/hour |
| 2 Floormen | @ $8.34/hour |

Each employee worked 56 hours per week and was paid 16 hours of pay, at time and a half. The calculation is as follows:

| 1 Driller | @ $11.22/hour | × 64 = | $ 718.08 |
|---|---|---|---|
| 1 Derrickman | @ $9.50/hour | × 64 = | $ 608.00 |
| 1 Motorman | @ $8.90/hour | × 64 = | $ 569.60 |
| 1 Floorman | @ $8.34/hour | × 64 = | $ 533.76 |
| 1 Floorman | @ $8.34/hour | × 64 = | $ 533.76 |
| | | | $2,963.20 |

$2,963.20 × 3 crews per day = $8,889.60

$8,889.60 divided by 7 days in a week = $1,269.94/day

## 2. LABOR BURDEN

This category includes Big Chief's cost over and above actual labor cost for the following:

(i) FICA Taxes
(ii) Worker's Compensation Insurance
(iii) General Liability Insurance
(iv) State Unemployment Compensation Insurance
(v) Federal Unemployment Compensation Insurance
(vi) Entex, Inc. Stock Purchase Plan
(vii) Pension Plan

---

All of the above items fluctuate in direct proportion to the total payroll. The source used by the court to arrive at the following percentages was the rig/well sub-ledger for July and August, 1983. The damages should be calculated as follows:

July:

Total Labor $46,656.33
Labor Burden 9,671.86
9,671.86 divided by 46,656.33 = 0.2073 or 20.73%
$1,269.94 (daily rig labor) $\times$ 20.73% = $263.26/day
$263.26 divided by 24 = $10.97/hour
$10.97/hour $\times$ 248 hours (claim interval in July) = $2,720.56

August:

Total Labor $35,562.58
Labor Burden 7,403.98
7,403.98 divided by 35,562.58 = 0.2082 or 20.82%
$1,269.94 (daily rig labor) $\times$ 20.82% = $264.40/day
$264.40 divided by 24 = $11.02/hour
$11.02/hour $\times$ 491 hours (claim interval in August) = $5,410.82
$2,720.56 (July) + $5,410.82 (August) = $8,131.38
$8,131.38 divided by 739 (total claim interval) = $11.00/hour
$11/hour $\times$ 24 (working hours/day) = $264.00/day

---

## 3. DIRECT SUPERVISION

Throughout the Big Hill project, Big Chief had two tool pushers assigned to each rig, working twelve hours on, and twelve hours off. Big Chief also had two tool pushers who were used as relief tool pushers who were to allow the regular tool pushers 2–4 days off approximately every three weeks. In addition, there was one tool pusher who worked on the project and was not assigned to a particular rig at any time.

All Big Chief tool pushers were paid a monthly salary, drove a company vehicle with a mobile phone, and had an expense account. Each month, a tool pusher cost allocation was written and given to the accounting department. The accounting department would then allocate a proportionate share of each tool pusher's cost to the various rigs based on what percentage of time he spent on each rig. The $551.39 cost entered in the Direct Supervision cost category is an average of the direct supervision costs for July and August found in the rig/well sub-ledgers for those months.

## 4. REPAIR AND MAINTENANCE

This category includes the cost of maintaining the rig and making necessary repairs, from time to time. It does not include expenditures for the purchase or overhaul of capital items such as engines or mud pumps. Examples of costs included in this category are lubricants, welding, chains, tong dies, rope, pipe dope, paint, mud valves, engine parts, hand tools and electrical parts.

The $1,332.73/day cost figure advanced by the plaintiff was calculated using the

rig/well sub-ledgers for May 1983 through June 1984. Because the claim interval in this case, however, is July 21, 1983 through August 22, 1983, this court feels that in calculating Repair and Maintenance costs, the expenses reflected by Big Chief's rig/well ledger for the months of July and August, 1983, rather than the entire cost experienced for the drilling of well number 108A and/or 108B should be considered. The court, therefore, calculates the revised rate for Repair and Maintenance as follows:

July:
0.323 (10 days of claim period/31 days in the month)
× $25,529.17 (total costs for repair and maintenance in July)

$ 8,245.92

August:
0.71 (22 days of claim period/31 days in the month)
× $16,816.05 (total costs for repair and maintenance in August)

$11,939.40

$8,245.92 + $11,939.40 = $20,185.32

$20,185.32 divided by
739 hours (Big Chief's claim interval) = $27.31/hour

$27.31 × 24 (working hours/day) = $655.44/day

---

### 5. DRILLING RECORDER RENTAL

The government did not question this element of plaintiff's claim. Moreover, two invoices for Totco Drilling Instrumentation cover the claim interval for this item. By taking the total of both invoices and dividing by the number of days invoiced, the calculation is as follows:

| 7/1/83–7/31/83 | $1,062.01 | 31 days |
| 8/1/83–8/28/83 | $ 959.23 | 28 days |
| | $2,021.24 | 59 days |

$2,021.24 divided by 59 days = $34.26/day

---

### 6. SINGLE SHOT RENTAL

Likewise, the government did not question this element of plaintiff's claim. This item also is confirmed by an invoice, in this case, an invoice from Sperry Sun. The daily rate is shown as $45/day.

### 7. MONEL DC RENTAL

Again, the government did not question this element of plaintiff's claim, and the item is confirmed by the Gammaloy's invoices. The daily rental payments are shown to be $60/day.

### 8. FUEL

Big Chief used L.P. fuel to operate the main drilling engines, and diesel to operate the generators. Plaintiff used the total fuel cost for well number 108A divided by the number of operating days to calculate its daily fuel costs. However, because the claim interval in this case is July 21, 1983 through August 22, 1983, this court feels that in calculating the daily fuel costs, the expenses reflected by Big Chief's rig/well sub-ledger for the months of July and August, 1983, rather than the entire cost experienced for the drilling of well number 108A, should be considered. Calculation of the revised rate for fuel is as follows:

July:

0.323 (10 days of claim period/31 days in the month)
× $19,542.81 (total costs for fuel in July)
$ 6,312.33

August:

0.71 (22 days of claim period/31 days in the month)
× $13,224.41 (total costs for fuel in August)
$ 9,389.33

$6,312.33 + $9,389.33 = $15,701.66

$15,701.66 divided by
739 hours (Big Chief's claim interval) = $21.25/hour

$21.25 × 24 (working hours/day) = $510.00/day

---

### 9. INDIRECT SUPERVISION

This item represents the salary, labor burden, and expenses of the on-site project manager, Richard Householder. To arrive at a daily cost, the rig/well sub-ledger was utilized. The project manager's costs were totaled each month and distributed to the ten wells on the project. The total expense for indirect supervision at well number 108A was $6,614.14. The court adopts the plaintiff's claim, as follows:

$6,614.14 divided by 129 days (total days on well number 108A) = $51.27/day

### 10. BOARD ROAD RENTAL

The government did not question this element of the claim. The cost is verified by the Mallard and Mallard, Inc., rental invoices as:

30 day cost of $20,489.66 divided by 30 = $682.99/day

### 11. RIG DEPRECIATION

 As part of its dayrate calculation for rig number 35, the plaintiff seeks to recover $669.21/day as rig depreciation. After hearing the testimony offered at trial concerning the calculation of depreciation, however, the court has determined that the $297.55/day is the appropriate sum to be used in the dayrate calculation for rig depreciation.

According to the defendant's expert witness, Michael Power, CPA, depreciation is the systematic distribution of the cost of a capital asset over a fixed period of time. A capital asset is an asset that has a useful life exceeding one year such as buildings, machinery and equipment. As Power testified at trial, a drilling rig is a capital asset subject to depreciation.

Power testified that generally accepted accounting principles require that the basis of an asset for purposes of calculating depreciation is its acquisition cost. Big Chief, however, used new replacement cost, instead of acquisition cost, as the basis for its depreciation calculation. According to the defendant's expert, Power, for the purposes of computing depreciation, there is no relationship between the acquisition cost of a capital asset and its new replacement cost.

In computing "Rig Depreciation," Item 11 of Big Chief's "Rig 35 Dayrate Calculation," Big Chief used the appraised replacement cost of rig 35 utilized for insurance purposes, rather than the adjusted acquisition cost of rig 35. The basis of computing depreciation for rig 35, as reflected in Big Chief's books of account, appears to be $1,308,233.40. The amount of depreciation reflected in Big Chief's accounting records for rig 35 for the period June 1, 1983 through December, 1983, is $58,320.01. Big Chief's accounting records also show that rig 35 was operated 196 days during the period from June 1, 1983 through December, 1983. Therefore, the court has recalculated the rig depreciation category as follows:

$58,320.01 (depreciation from 6/1/83 through 12/83) divided by 196 (days of operation from 6/1/83 through 12/83) = $297.55/day

### 12. DRILL PIPE DEPRECIATION

 The plaintiff's Rig 35 dayrate calculation includes $1,112.71 per day for

"drill pipe depreciation." Plaintiff computed this cost element by subtracting "salvage value from acquisition cost. Its calculation is based upon the fact that all drill pipe used at well number 108A was downgraded at the completion of the contract from Class I to Class IV pipe.

The plaintiff, however, anticipated from the outset that, because of the corrosive environment at Big Hill, the drill pipe used to construct the wells at the project, including well number 108A, would have to be downgraded to Class IV pipe. Therefore, the reclassification of the drill pipe, which is the predicate for Big Chief's depreciation calculation, was unrelated to the additional 739 hours required to complete well number 108A. The drill pipe was to be downgraded, notwithstanding the problems encountered at well number 108A.

William Glass did testify, however, that if Big Chief had constructed well number 108A in 739 hours less time, the drilling operation possibly would have required two or three fewer joints of drill pipe. Thus, Big Chief's claim for drill pipe should not exceed a total of $2,882.25, calculated as follows:

3 joints × 31.5 feet per joint = 94.5 feet
94.5 feet × $30.50 ($35/ft. less $4.50/ft. (salvage value) = $2,882.25

---

### 13. DRILL COLLAR DEPRECIATION

According to the testimony of the defendant's expert, Michael Power, CPA, the principles for depreciation discussed and applied to the calculation of "Rig Depreciation," item 11, discussed above, are the same principles to be used in the calculation of depreciation for a drill collar. In calculating drill collar depreciation for its "Rig 35 Dayrate Calculation," Big Chief used the appraised replacement cost of drill collars utilized for insurance purposes, rather than its acquisition cost of the drill collars used on rig 35. As William Glass, president of Big Chief testified on cross examination:

Q. The next item of cost is at page 1 of 35 of Plaintiff's 1011 is Item 13, drill collar depreciation. Do you see that?

A. Yes, sir.

Q. There you have $150 a day for that. Is that correct?

A. Yes, sir.

Q. The explanation for that calculation appears at page 14 of 35 of the claim summary?

A. Yes, sir.

Q. You have a total value listed for the drill collar depreciation of $46,125. Do you see that?

A. Yes, sir.

Q. What is the basis for that figure?

A. That's for new replacement value of the drill collar in '83 that were utilized on this particular rig.

Q. So, that is not what it actually cost Big Chief to purchase the drill collars?

A. I used new replacement cost value. I don't know what the cost was for each specific drill collar that was on location there.

Q. Would the cost of drill pipe and drill collars be an expense that would be booked and reflected in the company's books?

A. You mean whether they kept the depreciation on drill pipe and drill collars?

Q. No, when you went out and ordered me, you know, 50 drill collars or 'X' number of feet of drill pipe, would that be an expense that would be then in some way reflected in one of the company's books, ledgers, or whatever?

A. The only way they would do that in accounting, they throw that in, you have a drill pipe and a pool and/or a drill collar pool, the tubulars may all be together there. But in some accounting, in most cases some of them may separate all drill pipe, and they put that in a pool, and that's being depreciated for the books and for taxes. They do the same thing for drill collars, or sometimes they put them all together in a pool and they depreciate that pool.

Big Chief offered no additional specific testimony regarding its drill collar depreciation calculation, nor were any exhibits in-

troduced documenting Big Chief's actual acquisition costs for its drill collars. Therefore, because Big Chief used new replacement cost, instead of acquisition cost, as the basis for its drill collar depreciation calculation, the court rejects the plaintiff's claim for this item.

### 14. RIG INSURANCE

Rig insurance is for equipment only and insures against accidental damages, such as substructure collapse, derrick collapse, fire caused by welder and flooding. The premium is assessed by number of operating days each month. On the rig/well subledgers the cost of rig insurance is shown as $1,087.06 for July and $1086.06 for August and should be calculated as follows:

$1,087.06 + $1,086.06 = $2,173.12
$2,173.12 divided by 62 operating days = $35.05/day

### 15. SITE OVERHEAD

This category covers costs directly associated with the Big Hill project, however, the cost figures used by the plaintiff in the calculation of the daily cost for site overhead are not costs specifically related to the drilling at well number 108A. Rather, because Big Chief was operating several drilling rigs at the Big Hill site, and there was only one site office servicing the rigs. The total site overhead costs were totaled and shared evenly between all the rigs at the Big Hill site and were calculated by the plaintiff as follows:

Total site overhead at Big Hill— $498,522.67
Total days on the project— 246

$498,522.67 divided by 246 = $2,026.51/day

$2,026.51 divided by 5 rigs = $405.30/day/rig

---

Because there was only one site office at the Big Hill site set up to provide support services to each of Big Chief's drilling rigs, this court finds that the plaintiff's method of apportioning its costs for this item among the different drilling rigs was reasonable.

### 16. OKLAHOMA CITY OFFICE OVERHEAD

■■ The plaintiff's explanation of this cost item, included in the trial record as plaintiff's exhibit 1011, page 17 of 35, states, in full:

This entry was taken from the December 31, 1983 income statement and includes payroll and burden for Oklahoma City office management, accounting, data processing, personnel, secretarial and janitorial personnel. It also includes Oklahoma City office operating expenses such as utilities, grounds care, supplies, legal fees, advertising, trade organization dues, etc. Items which were already allocated to the project were excluded from the total to arrive at $1,441,248.47 year-to-date. Total rig operating days can be found on the drilling analysis

(1,268). Rig operating days (196) for Rig 35 (which consists of 108A and 108B only) can be found on the rig analysis.
Calculation:
196 divided by 1,268 = 15.4574%
$1,441,248.47 × 15.4574% = $222,-279.54 [222,779.54]
$222,779.54 divided by 196 = $1136.63/day

An examination of the plaintiff's consolidated income statement, dated December 31, 1983, reveals a figure of $1,484,375.63 as total general and administrative costs. On cross examination, William Glass testified as to how Big Chief arrived at the $1,441,248.47 figure used in its calculations for this cost item. In that regard, Glass testified as follows:

Q Can you find the entry on that document [plaintiff's exhibit 1018, p. 9] for us where the total—where the Oklahoma City office overhead is taken from?
\* \* \* \* \* \*
A At the top, the first total there where it says, "Total, General and Administrative," on the far right where it says "Actual," it states $1,484,375.63, and we took that figure and deducted House-

holder's overhead figure from that to arrive at the lesser figure of $1,441,-248.47.

\* \* \* \* \* \*

Q I'm sorry. When you say Mr. Householder's figure, you are referring to Item 9 of the claim summary, the claim for indirect supervision?

A Yes, sir.

Q The total expense for that was $6,614.14. Is that right?

A That's correct. The accounting figures don't jive to the penny if you subtract them out, but I don't know what the difference is.

In fact, the difference between the cost figure included in Big Chief's consolidated income statement and the figure used by the plaintiff in its calculation of the Oklahoma City office overhead is $43,127.16. Subtracting the $6,614.14 figure for Householder's overhead from $43,127.16 results in $36,513.02 of unexplained costs deleted by the plaintiff from the total in the plaintiff's consolidated income statement when determining the total overhead costs to be applied to this cost calculation. This illustrates the fundamental problem the court has with this particular cost calculation made by the plaintiff. Aside from the cross examination testimony of William Glass, there is no other testimony in the record, nor is there any more complete explanation of how these costs were determined beyond that quoted above, to assist the court in reaching an accurate cost calculation for this item. Therefore, the plaintiff's Oklahoma City Office Overhead daily cost calculations are denied.

### 17. HOUSTON CORPORATE OFFICE OVERHEAD

This item allegedly represents the amount which was assessed to Big Chief for its proportionate share of overhead associated with its parent company, Entex, Inc. Citing to page nine of Big Chief's December 31, 1983 consolidated income statement, plaintiff's exhibit 1018, the plaintiff claims that a total of $465,884.27 was assessed to Big Chief as Houston corporate office overhead. The $465,884.27 figure is calculated by adding $248,884.27 in overhead charges from Entex, Inc., and $217,000.00 charged to Big Chief Drilling Company Administration as overhead. However, the plaintiff's consolidated income statement does not breakdown these costs by month, and there is no testimony in the record explaining how these figures are to be applied in making a cost calculation for this item. Therefore, because the court is unwilling to average figures that represent total overhead costs for a seven month time period, to determine a figure to be applied to the cost calculation for the two relevant months, the plaintiff's claim for these costs must be denied.

### 18. YARD AND SHOP ALLOCATION

This item, unquestioned by the defendant, consists of a proportionate share of all costs associated with Big Chief trucks and drivers, Big Chief electricians, supplies, yard and shop employees, and yard and shop maintenance. A total cost for all items was accumulated each month and distributed to the various rigs, based on number of operating days. The amounts found on the rig/well sub-ledgers for July and August, 1983, are calculated at follows:

| July | $ 56,525.48 |
|------|-------------|
| August | $ 56,379.86 |
| Total | $112,905.34 |

$112,905.34 divided by 62 (July–August) =$1,821.05/day

---

### 19. MISCELLANEOUS TRUCKING

This item consists of trucking costs charged to Big Chief for trucks used to deliver or transfer equipment needed to operate rig 35, and outside vendor charges for trucking of supplies, equipment, and rental tools. The plaintiff calculated its costs for miscellaneous trucking by using

the total cost for well number 108A and dividing that figure by the total days involved in the completion of the well. However, because the claim interval in this case is July 21, 1983 through August 22, 1983, this court feels that in calculating Miscellaneous Trucking costs, the expenses reflected by Big Chief's rig/well sub-ledger for the months of July and August, 1983, rather than the entire cost experienced for the drilling of well number 108A, should be considered. Calculation of the revised rate for Miscellaneous Trucking is as follows:

July:
0.323 (10 days of claim period/31 days in the month)
 × $ 451.50 (total costs for miscellaneous trucking in July)

 $ 145.83

August:
0.71 (22 days of claim period/31 days in the month)
 × $1,831.01 (total costs for miscellaneous trucking in August) .

 $ 1,300.02

$ 145.83 + $1,300.02 = $1,445.85

$1,445.85 divided by
739 hours (Big Chief's claim interval) = $1.96/hour

$ 1.96 × 24 (working hours/day) = $47.04/day

---

### 20. QUALITY ASSURANCE

This item, also unquestioned by the government, consists of Big Chief's costs for Summerville Inspection Service to perform the quality assurance and quality control functions required by the contract. The amount claimed by plaintiff is found in the rig/well ledger under "Other Special Services." The total cost for well number 108A was $19,624.84. Calculation of the day rate is as follows:

$19,624.84 divided by 129 (total days on well number 108A) = $152.13/day

### 21. MISCELLANEOUS RENTALS

This item consists of rental equipment used to drill well number 108A. Some of the items included are 21–¼ inch blowout preventers, pony drill collars, slickline units and fishing tools. Again, the plaintiff calculated its daily rate for Miscellaneous Rentals by using the total cost for well number 108A and dividing that figure by the total days involved in completing the well. However, because the claim interval in this case is July 21, 1983 through August 22, 1983, this court feels that in calculating Miscellaneous Rental costs, the expenses reflected by Big Chief's rig/well sub-ledger for the months of July and August, 1983, rather than the entire cost experienced for the drilling of well number 108A, should be considered. Calculation of the revised rate for Miscellaneous Rentals is as follows:

July:
0.323 (10 days of claim period/31 days in the month)
 × $14,941.42 (total costs for miscellaneous rentals in July)

 $ 4,826.09

August:
0.71 (22 days of claim period/31 days in the month)
 × $ – (total costs for miscellaneous rentals in August)
 0 –

 $ – 0 –

$ 4,826.09 + – 0 – = $4,829.09

$ 4,826.09 divided by

739 hours (Big Chief's claim interval) = $6.53/hour

$ 6.53 × 24 (working hours/day) = $156.72/day

---

### 22/24. BRINE WATER AND WATER DISPOSAL

These cost categories are being combined because on the rig/well ledger, all listings for Pumps and Tanks, Inc., the plaintiff's subcontractor, are either for brine or waste water disposal. Again, the plaintiff calculated its daily rate for Miscellaneous Rentals by using the total cost for well number 108A and dividing that figure by the total days involved in completing the well. However, because the claim interval in this case is July 21, 1983 through August 22, 1983, this court feels that in calculating Brine Water and Water Disposal costs, the expenses reflected by Big Chief's rig/well sub-ledger for the months of July and August, 1983, rather than the entire cost experienced for the drilling of well number 108A, should be considered. Calculation of the revised rate for Brine Water and Water Disposal results in:

July:

0.323 (10 days of claim period/31 days in the month)
× $ 5,661.00 (total costs for brine and waste in July)

 $ 1,828.50

August:

0.71 (22 days of claim period/31 days in the month)
× $ 7,716.83 (total costs for brine and waste in August)

 $ 5,478.95

$ 1,828.50 + $5,478.95 = $7,307.45

$ 7,307.45 divided by
739 hours (Big Chief's claim interval) = $9.89/hour

$ 9.89 × 24 (working hours/day) = $237.36/day

---

### 23. CUTTINGS DISPOSAL

This item consists of the invoices from Triangle Industrial Services for vac-alls and vacuum trucks to transfer cuttings from each rig's catch boy to the disposal pits. The plaintiff calculated its daily rate for Cuttings Disposal by using the total cost for well number 108A and dividing that figure by the total days involved in completing the well. However, because the claim interval in this case is July 21, 1983 through August 22, 1983, this court feels that in calculating Cuttings Disposal costs, the expenses reflected by Big Chief's rig/well sub-ledger for the months of July and August, 1983, rather than the entire cost experienced for the drilling of well number 108A, should be considered. Calculation of the revised rate for Cuttings Disposal is as follows:

July:

0.323 (10 days of claim period/31 days in the month)
× $ 8,612.40 (total costs for cuttings disposal in July)

 $ 2,781.81

August:

0.71 (22 days of claim period/31 days in the month)
× $ 8,031.50 (total costs for cuttings disposal in August)

 $ 5,702.37

$ 2,781.81 + $ 5,702.37 = $ 8,484.18

$ 8,484.18 divided by
739 hours (Big Chief's claim interval) = $11.48/hour

$11.48 × 24 (working hours/day) = $275.52/day

### 25. TESTING

■ This item allegedly represents costs for performing blowout preventer tests at various times during the drilling of well number 108A. The plaintiff calculated its daily costs for this item by referring to individual cost entries found in the rig/well sub-ledger. The plaintiff determined that the daily cost for the Testing item should be $15.56/day. The court, however, rejects the plaintiff's claim for this item.

The only substantiation offered by the plaintiff to support these daily costs for testing, is the plaintiff's rig/well sub-ledger. The plaintiff's rig/well sub-ledger contains several lists of items categorized under "Logs/Surveys/Tests," and the plaintiff selected only three items out of two of these lists as representing costs for blowout preventer tests:

| | | |
|---|---|---|
| 9/30/83 | APEX –DOE | $ 668.25 |
| 9/30/83 | TECH PIPE SERV–DOE | 1,090.00 |
| 10/31/83 | APEX –DOE | 230.00 |
| | TOTAL | 1,988.25 |

The plaintiff has offered no explanation for why the three items immediately above were chosen as representing the plaintiff's costs for blowout preventer tests. Furthermore, the plaintiff's rig/well sub-ledger contains no notations, other than the handwritten numbers plaintiff added at some unknown time, and without explanation, to segregate individual costs, to distinguish between the several items listed under "Logs/Surveys/Tests." For example, one "Logs/Surveys/Tests" list contains the following entries:

| | | |
|---|---|---|
| 9/30/83 | MID CONT–DOE | 209.37 |
| 9/30/83 | LYNES–DOE | 835.00 |
| 9/30/83 | GEARHART–DOE | 3,180.91 |
| 9/30/83 | APEX–DOE | 668.25 |
| 9/30/83 | GEARHART–DOE RIG # 35 | 4,079.39 |
| 9/30/83 | GEARHART–DOE | 1,335.06 |
| 9/30/83 | GEARHART–DOE | 909.49 |
| 9/30/83 | GEARHART–DOE | 4,105.07 |
| 9/30/83 | TECH PIPE SERV–DOE | 1,090.00 |
| 9/30/83 | MID–CONT–DOE–CV # 286 | 209.37 |

Plaintiff has offered no explanation for why the fourth and ninth items included in this second list represent the same costs claimed by plaintiff for performing blowout preventer tests.

Moreover, none of the three cost items claimed by the plaintiff occurred during the claim period involved in this case. In addition, because there has been no testimony regarding the nature of these three tests, and why they were performed, the court is unable to grant any recovery for this cost item.

### 26. MECHANICAL ALLOCATION

This item consists of the salary and expenses for company mechanics. During the Big Hill project, Big Chief had one mechanic assigned to the project full-time. He would call additional mechanics to assist him on an as needed basis. Each month, an allocation sheet was prepared and a proportionate share of the total costs for mechanics were allocated to the appropriate rigs. These costs are documented in the plaintiff's rig/well ledgers. To calculate the mechanical allocation for well number 108A, the plaintiff added to mechanical costs from June, 1983 to January, 1984, and then divided that figure by 196 (the

total number of days necessary to complete wells number 108A and 108B). However, because the claim interval in this case is July 21, 1983 through August 22, 1983, this court feels that in calculating costs for the mechanical allocation, the expenses reflected by Big Chief's rig/well sub-ledger for the months of July and August, 1983, rather than the entire cost experienced for the drilling of well number 108A and 108B, should be considered. Calculation of the revised rate for Mechanical Allocation is as follows:

July:

0.323 (10 days of claim period/31 days in the month)
$\times$ $ 9,141.67 (total mechanic costs in July)

$ 2,952.76

August:

0.71 (22 days of claim period/31 days in the month)
$\times$ $ 4,951.47 (total mechanic costs in August)

$ 3,515.54

$ 2,952.67 + $ 3,515.54 = $ 6,468.21

$ 6,468.21 divided by
739 hours (Big Chief's claim interval) = $8.75/hour

$ 8.75 $\times$ 24 (working hours/day) = $210.00/day

---

### 27. FRESH WATER

This item, also unquestioned by the defendant, consists of the potable water used on the rig for the rig superintendent's office. The costs for this item are found in the rig/well sub-ledger under "Water." The total for well number 108A was $10,409.73, and should be calculated as follows:

$10,409.73 divided by 129 = $80.70/day

### 28. RISK

This item was included by plaintiff to account for the uninsurable portion of rig accidents, major equipment failure, or well blow-out, and was not challenged by the government. The amount due plaintiff is calculated as follows:

| Occurrence | Est. Cost | Probability/Well | Net |
|---|---|---|---|
| Derrick collapse | 325,000 | 3% | 9,750 |
| Substructure collapse | 650,000 | .5% | 3,250 |
| Blown engine | 90,000 | 8% | 7,200 |
| Mud pump failure | 210,000 | 4% | 8,400 |
| Other equipment failure | 50,000 | 20% | 10,000 |
| Well Blowout | 2,500,000 | .3% | 7,500 |
| | | | $46,100 |

$46,100 divided by 129 (total days on well number 108A) = $357.36/day

---

### 29. BITS/REAMERS/STABILIZERS

This item consists of the downhole drilling tools purchased or rented for the drilling of well number 108A. The plaintiff calculated its figures using an average daily cost for the duration of time required to complete well number 108A. However, because the claim interval in this case is July 21, 1983 through August 22, 1983, this court feels that in calculating costs for Bits/Reamers/Stabilizers, the expenses reflected by Big Chief's rig/well sub-ledger for the months of July and August, 1983, rather than the entire cost experienced for the drilling of well number 108A, should be considered. Calculation of the revised rate for Bits/Reamers/Stabilizers results in the following damages:

July:

0.323 (10 days of claim period/31 days in the month)
× $9,937.50 (total costs for cuttings disposal in July)

$3,209.81

August:

0.71 (22 days of claim period/31 days in the month)
× $16,771.50 (total costs for cuttings disposal in August)

$11,907.77

$3,209.81 + $11,907.77 = $15,117.58

$15,117.58 divided by
739 hours (Big Chief's claim interval) = $20.46/hour
$20.46 × 24 (working hours/day) = $491.04/day

---

#### 30. CEMENT PLUGS

This category consists of all the costs incurred placing cement plugs during the course of the claim interval. Although the defendant did not challenge this portion of plaintiff's claim, the court has recalculated the amount due as follows:

| | |
|---|---|
| July 22, 1983 | $2,265.86 |
| July 24 | 1,748.36 |
| August 1 | 2,262.23 |
| August 1 | 2,492.67 |
| August 2 | 2,437.63 |
| August 5 | 2,004.65 |
| August 10 | 2,250.68 |
| August 13 | 1,894.37 |
| August 14 | 2,264.96 |
| August 15 | 3,525.02 |
| August 15 | 4,757.44 |
| August 16 | 8,535.53 |
| August 19 | 2,145.41 |
| August 19 | 2,049.41 |
| August 20 | 2,054.36 |
| August 20 | 3,354.99 |
| August 21 | 1,800.11 |
| August 21 | 1,744.31 |
| TOTAL | $49,587.99 |

$49,587.99 divided by 739 hours = $67.10/hour
$67.10 × 24 (working hours/day) = $1610.40/day

---

In the Daily Rig Rate Calculation, plaintiff's exhibit 1011, the plaintiff includes a claim for the placing of a cement plug on July 30, 1983, costing $3,596.65. There is no invoice from The Western Company included in plaintiff's exhibit 1019 reflecting this cost for July 30, 1983. Moreover, from an examination of the IADC–API log for well number 108A, it is apparent that there was no plug placed on July 30, 1983. Therefore, the court's cost calculation excludes the plaintiff's July 30, 1983 figure.

#### 31. TEMPERATURE LOGS

This item, also not disputed by the defendant, consists of the costs for running the four temperature logs taken during the claim interval, and should be calculated as follows:

| | |
|---|---|
| July 24, 1983 | $ 897.20 |
| August 9 | 1,425.69 |
| August 13 | 1,550.27 |
| August 14 | 1,550.27 |
| TOTAL | $5,432.43 |

$5,432.43 divided by 739 hours = $7.35/hour
$7.35 × 24 (working hours/day) = $176.40/day

### COURT'S REVISED AND FINAL
### RIG 35 DAYRATE CALCULATION

| COST CATEGORY | DAILY COST |
|---|---|
| 1. RIG LABOR | $ 1,269.94 |
| 2. LABOR BURDEN | 264.00 |
| 3. DIRECT SUPERVISION | 551.39 |
| 4. REPAIR AND MAINTENANCE | 655.44 |
| 5. DRILLING RECORDER RENTAL | 34.26 |
| 6. SINGLE SHOT RENTAL | 45.00 |
| 7. MONEL DC RENTAL | 60.00 |
| 8. FUEL | 510.00 |
| 9. INDIRECT SUPERVISION | 51.27 |
| 10. BOARD ROAD RENTAL | 682.99 |
| 11. RIG DEPRECIATION | 297.55 |
| 12. DRILL PIPE DEPRECIATION [See Total Cost Calculation Below] | |
| 13. DRILL COLLAR DEPRECIATION | – 0 – |
| 14. RIG INSURANCE | 35.05 |
| 15. SITE OVERHEAD | 405.30 |
| 16. OKLAHOMA CITY OFFICE OVERHEAD | – 0 – |
| 17. HOUSTON CORPORATE OFFICE OVERHEAD | – 0 – |
| 18. YARD AND SHOP ALLOCATION | 1,821.05 |
| 19. MISCELLANEOUS TRUCKING | 47.04 |
| 20. QUALITY ASSURANCE/QUALITY CONTROL | 152.13 |
| 21. MISCELLANEOUS RENTALS | 156.72 |
| 22. BRINE WATER | (See Below) |
| 23. CUTTINGS DISPOSAL | 275.52 |
| 24. WATER DISPOSAL | (See Below) |
| 25. TESTING | – 0 – |
| 26. MECHANIC ALLOCATION | 210.00 |
| 27. FRESH WATER | 80.70 |
| 28. RISK | 357.36 |
| 29. BITS/REAMERS/STABILIZERS | 491.04 |
| 30. CEMENT PLUGS | 1,610.40 |
| 31. TEMPERATURE LOGS | 176.40 |
| 22/24. BRINE WATER AND WATER DISPOSAL | $ 237.36 |
| DAILY RIG RATE | $10,477.91 |

FINAL RIG RATE CALCULATION

Daily rig rate $10,477.91 divided by 24 (working hours/day) =
 Hourly rig rate—$436.58
$436.58 (Hourly Rig Rate) × 739 (Total Hours of Claim Interval) =
TOTAL RIG RATE FOR CLAIM PERIOD—$322,632.62

---

CEMENT SQUEEZE JOBS

The plaintiff seeks an additional sum of $50,821.80 as costs incurred in repairing the lost casing shoe through the use of six Bradenhead cement squeeze jobs. The plaintiff provided six invoices from The Western Company, plaintiff's exhibit 1021, reflecting the individual costs of each cement squeeze job. Those invoices confirm the total $50,821.80 claimed by the plaintiff.

MUD COST

The plaintiff seeks an additional sum of $51,374.05 for mud costs incurred during the claim period. The documentation sub-

mitted by Big Chief in plaintiff's exhibit 1011 and 1016 confirms the plaintiff's claimed costs for the additional mud costs.

## TEN PERCENT OVERHEAD ON CEMENT SQUEEZE JOB AND MUD COSTS

█ The plaintiff's claim includes a ten percent overhead mark-up on the $102,195.85 claimed for cement squeeze jobs and mud costs. At trial, however, William Glass, Big Chief's president, was not able to justify as overhead the $10,219.59 claimed. Glass testified, on cross examination, as follows:

Q How did you go about computing the 10 percent overhead?

A We thought that was better than 15. Normally, we charge up to 15 percent for handling materials or things of that nature for an operator.

Q But in the case of your calculation here, do you not have already built into your claim as items 9, 15, 16, 17, and 18 all of the overhead that Big Chief actually experienced during the course of this job?

A Well, that overhead is an overhead cost that we're processing this paper here, but we're ordering materials. We have some items direct and everything, that's not an unusual charge to do it this way for any of the operators that we work for.

Q Well, it may not be unusual for you to do it that way, but isn't it, in fact, a charge for overhead that you really didn't experience?

A We feel that in handling this 32 days for the Government we are damn sure entitled to it.

 * * * * * *

Q Could you explain for me, in terms of the markup on these two items, the 10 percent, comes to $10,000. What kinds of services or activities or operations would be affected by the handling of the cement squeeze jobs or the mud that would generate some kind of expense to the company over and above the invoice price of those two items?

A The thing that comes mainly to mind would be that you're handling all of those things that after the fact, after the project has ended. You've got overhead for all of the paper work and everything else trying to get it altogether so it can be billed and you get reimbursed.

Q And that's paper work that's performed by persons who would have been assigned to Big Chief's Oklahoma City office. Right?

A Well, it may be, and it may not be.

Q It could be performed by Big Chief personnel assigned to the project site at Big Hill?

A It would be after, you know, this is after the fact for the paper work and all of the administrative that's part of this lawsuit.

Q So, it's more likely than not it would have been performed some place other than the project site?

A Well, your bills always come in later, so it's possible that some of the administrative costs went to finalize, and to keep records, and to bill, and to collect, and store, and everything. You have additional costs that goes on and on for any records that you are keeping for any of your Clients.

Q To the extent that anybody in your Oklahoma City Office is performing those functions? Is not the expense associated with those people picked up as a part of the Oklahoma City Office overhead, which is Item 16 of the cost category for the daily rig rate?

A Only, if through that period of time, if all of this had been handled. If it had been handled after that, the answer is no. But if it was handled at the time that all of that paper work and all of that had been done at the time it was actually billed, then the answer would be yes.

Q Do you know when the paper work was performed?

A I don't think it will ever be finished.

Q Pardon me?

A I don't think the paper work will ever be finished.

Q I'm sorry, you've lost me. Let's take the mud cost—

A Well, all of your records and all of that contained in this particular squeeze jobs and mud costs, we've got to maintain those files, we've got to store them, and we're yet to collect on them. So, the overhead is still going on.

Q That function of storing those—how many records are we talking about here? How many pieces of paper?

A I don't know.

Q In any event, it's that expense that justifies, in your view, 10 percent of $102,000 or $10,000?

A I would normally use a 15 percent figure.

Q So, you would take $15,000 normally for that? You gave us a break on the claim. Is that it?

A Oh, I just said that, you know, we go for 10 percent. It was a judgment call.

Therefore, because William Glass was unable to justify as overhead the $10,219.59 claimed by Big Chief on the additional cement and mud costs, and, due to the lack of any further testimony supporting plaintiff's claim for additional overhead costs, the court denies this item of the plaintiff's claim.

FIFTEEN PERCENT PROFIT

The plaintiff asserts that in addition to being compensated for its out-of-pocket expenses, it should also be granted "the benefit of its bargain." In its post trial brief, the plaintiff argues, "[i]n this case, Big Chief should be allowed to recover the loss it incurred as a result of the government's breach, including the profits it would nor-

mally have made for the number of drilling days involved during the claim period."

"When a breach of contract is proven, damages may include compensation for pecuniary loss, such as profits that could have been realized but for the breach, that are a consequence of the breach." *Town of North Bonneville v. United States*, 11 Cl.Ct. 694, 726, *affirmed in part, reversed in part*, 833 F.2d 1024 (1987) (mem.), *cert. denied*, 485 U.S. 1007, 108 S.Ct. 1470, 99 L.Ed.2d 699 (1988). However, the recovery of consequential damages requires proof that such consequence was foreseeable in the normal course of events, that the loss in fact would have occurred, and that the amount of the loss is susceptible to reasonable ascertainment. *Id.*

In this case, the defendant clearly breached its contract with the plaintiff. Moreover, such damages were foreseeable, the loss to the plaintiff did in fact occur, and the amount of the loss is susceptible to reasonable ascertainment by reference to the costs contained in the daily rig rate calculation for the claim interval, as determined by the court, including additional costs incurred for the cement squeeze jobs and mud. Therefore, the plaintiff is entitled to recover the profit it would have realized but for the defendant's breach.

COST CALCULATION

| | |
|---|---|
| RIG RATE FOR CLAIM INTERVAL | $322,632.62 |
| DRILL PIPE | 2,882.25 |
| CEMENT SQUEEZE JOBS | 50,821.80 |
| MUD COST | 51,374.05 |
| SUB–TOTAL | $427,710.72 |
| 15 PERCENT PROFIT | $ 64,156.61 |
| TOTAL RECOVERY | $491,867.33 |

CONCLUSION

Based on the court's opportunity to observe the witnesses at trial, to review the documentary evidence presented and to consider the relevant legal precedent, the court finds that the plaintiff is entitled to recover in accordance with the cost calcula-

tion found immediately above, together with applicable statutory interest.

IT IS SO ORDERED.